**RIZAL COMMERCIAL BANKING CORPORATION, a Philippine corporation, Appellant,**

v.

**Ned PUTNAM, Appellee.**

**No. 23018.**

United States Court of Appeals, Ninth Circuit.

July 10, 1970.

Alan Hart (argued), of Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, Or., for appellant.

Cleveland C. Cory (argued), Clarence R. Wicks, Don H. Marmaduke, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for appellee.

Before HAMLEY and WRIGHT, Circuit Judges, and SMITH, District Judge.[*]

HAMLEY, Circuit Judge:

Rizal Commercial Banking Corporation (Rizal), a Philippine corporation, brought this diversity suit against Ned Putnam, a citizen of the State of Oregon, in the United States District Court for the District of Oregon. Rizal sought to recover $231,142.77 from Putnam under a guaranty undertaking covering a loan on a deferred letter of credit which Rizal had granted to Big Chrome Exploration Co., Inc. (Big Chrome), a Philippine corporation. The jury returned general and specific verdicts for Putnam and judgment was entered thereon. This appeal followed.

In March, 1963, Putnam became interested in an effort being made by Big Chrome to finance and develop a refractory chrome mine a few hours' drive from Manila, in the Philippines. At this time Jose Robles was president and Bernabe Ang was vice-president of Big Chrome. After conducting studies in the Philippines and the United States, Putnam formulated a mining proposal which he submitted to Robles and Ang. They notified Putnam that Big Chrome was interested in accepting his suggestions. At this point Putnam and Wayne Fogelstrom, vice-president of Discal Corporation (Discal), a San Francisco-based exporter of machinery and equipment, decided to participate in the mining venture.

The proposed financing of the project contemplated the issuance of a $300,000 letter of credit by a Philippine bank for the benefit of Big Chrome. Negotiations to this end were carried on by Robles and Ang, for Big Chrome, with Daniel Chiong, then assistant vice-president of Rizal. While these negotiations were in progress, Robles and Ang, for Big Chrome, entered into a formal written contract with Putnam and Fogelstrom defining their respective obligations in the mining venture.

Under this agreement, Putnam and Fogelstrom agreed to supervise the field operations of the mine. They also agreed to secure credit accommodations from a Philippine bank to enable Big Chrome to open a $300,000 letter of credit for the purchase of the mining equipment from Discal. This called for the payment of a $60,000 marginal deposit by Putnam and Fogelstrom.[1] The bank (Rizal), which later agreed to issue the letter of credit, raised the amount of the required deposit to $67,-358.93, and this sum was changed to an interest-bearing fixed deposit.

On June 24, 1963, Discal executed its final invoice directed to Big Chrome,

[*] The Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

[1.] The agreement also provided that fifty percent of the net profits would be used to liquidate the bank loan. Putnam and Fogelstrom were to receive ten percent of the net profits until the loan was repaid, and twenty percent of the net profits thereafter. The agreement also provided for a two percent stock option for Putnam and Fogelstrom.

covering equipment purchased for the mining venture. The total amount involved was $300,039.78, of which twenty percent was paid at the outset. The balance of $240,031.82 was to be paid in six semiannual installments of $29,403.88 each, including interest at seven percent.

Putnam and Fogelstrom thereafter each paid $48,000 to Big Chrome, to provide for the deposit with Rizal, and for working capital needed by Big Chrome in getting the mining venture under way. Rizal then approved issuance of a letter of credit in the amount of $269,-435.70. This approval was expressly made subject to five stated conditions. The fifth condition stated that the loan was payable in three years, with semiannual payments, and that "failure to pay any one installment makes the account due and payable in full."

On August 8, 1963, Big Chrome made the required deposit. At that time, pursuant to other conditions of the loan, Ang and his uncle, Ang Lam, executed a guaranty undertaking making them jointly and severally liable as guarantors of the Big Chrome loan. Rizal then issued the letter of credit. Also as a condition of the loan, Putnam and Fogelstrom subsequently executed a similar guaranty undertaking on December 13, 1963.

Due to circumstances which are not here relevant, it became impossible for Big Chrome to proceed with the venture, or to pay Rizal the first payment on the loan, which was overdue June 28, 1964. The present action was commenced against Putnam on March 17, 1967. Putnam defended on the following alternative grounds: (1) there was no valid cause (a concept somewhat analogous to consideration under the Civil Code applicable in the Philippines), or consideration, for Putnam's execution of the undertaking; (2) Putnam signed the undertaking as a result of a mistake going to the substance of the subject matter; and (3) the guaranty, if otherwise valid, was extinguished by extensions of time for payments due under the letter of

credit given by Rizal to Big Chrome assertedly without Putnam's consent.

There was extensive pretrial argument on the question of whether the undertaking itself evidenced Putnam's consent to the extensions assertedly granted to Big Chrome by Rizal. This led to the filing of a memorandum opinion, on the day prior to commencement of the trial, in which the district court expressed the view that Putnam's consent had been so evidenced. Nevertheless, no limitation was placed upon the reception of evidence concerning Putnam's extension defense.

At the close of all the evidence, Putnam moved for a directed verdict on each of the three grounds relied upon in his answer, as set out above. The trial court reserved its ruling on this motion. However, when it instructed the jury, the trial court adhered to its earlier view that the extension defense was not available to Putnam. Thus, the court submitted to the jury Putnam's cause-consideration and mistake defenses, but not his extension defense.

In addition to its general verdict for Putnam, the jury returned special verdicts finding that the undertaking was not supported by valid cause or consideration, and that defendant entered into the agreement under a mistake sufficient to avoid the undertaking. Rizal moved for judgment n. o. v. or for a new trial arguing, among other things, that each of the special verdicts was contrary to the law and evidence. Putnam opposed these motions. Putnam also argued (by renewing his motion for a directed verdict) that the general verdict was supportable on an additional independent ground, namely that Rizal had, without Putnam's consent, granted Big Chrome extensions of time to repay the loan.

The trial court denied Rizal's motion for judgment n. o. v. or, in the alternative, for a new trial. The court declined to change its prior ruling on Putnam's renewed motion for a directed verdict,

but indicated considerable misgivings concerning that ruling.

On its appeal Rizal argues that Putnam's execution of the undertaking was supported by valid cause and by consideration, and that, because of his own negligence, Putnam is bound by the undertaking even if he signed it without knowing its contents.

■ Putnam purports to cross-appeal from the denial of his motion for a directed verdict on the extension issue. But since Putnam is content with the judgment, which is in his favor, this argument is really one to affirm upon a ground not relied upon by the trial court. No cross-appeal was necessary. A successful party in the district court may have his judgment sustained on any ground that finds support in the record. Jaffke v. Dunham, Trustee, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957); M. O. S. Corporation v. John D. Haas Co., 375 F.2d 614, 617 (9th Cir. 1967).

We first consider whether the judgment for Putnam was required because, under the undisputed evidence, his guaranty (assuming its validity) was extinguished by extensions of time given by Rizal to Big Chrome without Putnam's consent.[2]

The governing rule, set forth in Art. 2079 of the Philippine Civil Code (Code) reads:

"An extension granted to the debtor by the creditor without the consent of the guarantor extinguishes the guaranty. The mere failure on the part of the creditor to demand payment after the debt has become due does not of itself constitute any extension of time referred to herein."

The parties are agreed that whether Art. 2079 operates to relieve Putnam from liability under the guaranty undertaking which he executed depends upon the answer to two questions: (1) Do the undisputed facts show that Rizal granted extensions of time to Big Chrome; and (2) If there were such extensions, did Putnam consent to them?

Turning to the first of these questions, it appears that Rizal first advanced funds under the letter of credit on May 16, 1964, in the amount of $48,-406.41. On May 29, 1969, Rizal sent its statement to Big Chrome for the amount so advanced. Chiong advised Big Chrome that the amount shown on the statement was immediately due, and would become delinquent after thirty days.[3] Thus, having in view condition five of Rizal's approval of the letter of credit, referred to above, Rizal had a right, in the event of nonpayment, to sue Big Chrome for the full amount of the letter of credit after June 28, 1964. Or it could choose to sue only in the amount then due, foregoing acceleration.

On June 10, 1964, Rudolfo Pineda, Rizal's attorney, wrote to Big Chrome requesting payment of the amount that became due on May 29, 1964. Big Chrome did not reply to this letter. On October 2, 1964, Pineda wrote to Big Chrome again, asking for prompt payment of the amount due not later than October 15, 1964.

Robles replied on October 14, 1964, requesting that Big Chrome be allowed thirty days from October 14, 1964, within which to pay "the first or all amortizations" on the letter of credit. In explaining this request, Robles stated that he expected Development Bank of the Philippines (DBP) to approve Big Chrome's application for a loan within two or three weeks. Robles also stated that, if this request were granted, Big Chrome hoped to settle its obligations "in full." By this, Robles meant that it planned to pay Rizal "in one lump sum." This, he said, would be necessary because Big Chrome planned to mortgage

2. If the evidence relevant to this issue was in dispute, a holding for Putnam could at most result in granting him a new trial, since Rizal is entitled to a jury finding on disputed questions of fact. However, in this case, the facts are not in dispute as to this matter.

3. Rizal sent similar statements to Big Chrome with regard to each subsequent advance under the letter of credit.

its machinery and equipment "to the financiers."

In actuality, Big Chrome's application to DBP had been rejected about a month previously. On October 19, 1964, Pineda, having heard of the DBP rejection, wrote to Robles. Referring to Robles' letter of October 14, 1964, as a request for an "extension of 30 days within which to pay the first amortization or all amortizations," Pineda wrote:

"We would have granted your said request were it not for the information received from the DBP that the loan which you applied for with the Bank was rejected about two months ago * * *.

"In view of the foregoing, you are hereby given fifteen (15) days from date hereof to make the necessary explanations why your request for extension should not be denied. Your failure in this regard will compel us to go after your security for the satisfaction of your obligation."

Robles replied to Pineda under date of November 13, 1964. He explained that Big Chrome had been advised by a DBP official to refile its application, and stated that this had been done. Robles urged Rizal to extend Big Chrome further consideration by not pressing for payment of the account, saying:

"* * * at this time that we are in a transition period; since, as you know, one of the purposes of our loan application with the DBP is to pay our said account with your bank in full."

Replying on November 16, 1964, Fernando E. V. Sisson, president of Rizal, stated:

"* * * please be informed that we are giving in to your request for extension but only up to December 15, 1964.

"* * * in granting you this last extension for payment, we are relying solely on the good faith and integrity of the persons who are in the reins of Big Chrome Exploration Co., Inc."

There was subsequent extensive correspondence between Big Chrome and Rizal, extending the time of payment to January 24, 1966, as Big Chrome sought and obtained, time after time, Rizal's forbearance in instituting legal proceedings to collect the loan. On November 23, 1966, Rizal for the first time made formal demand upon Putnam, based upon his execution of the guaranty undertaking.

In our opinion, the writings described above establish beyond dispute that, at least by November 16, 1964, Rizal had expressly granted Big Chrome one or more extensions of time within which to pay its obligation secured by Putnam's guaranty undertaking.[4]

It is true, as Rizal urges, that under Art. 2079 of the Code, an extension of time granted to the debtor will not extinguish a guaranty unless the extension is contractually binding and enforceable against the creditor. Radio Corporation of the Philippines v. Roa, 62 Phil. 211 (1935); Hongkong & Shanghai Banking Corporation v. Aldecoa & Co., 30 Phil. 255, 269 (1915).

The extensions granted to Big Chrome up to November 16, 1964, if not thereafter, were in sufficiently express and precise terms to constitute contractual undertakings. However, in order to be contractually binding and enforceable against Rizal, it was also necessary that the extensions be supported by either consideration or cause. We think they were supported by both.

Paragraph 5 of the commercial letter of credit provides that, should the time limit specified in the letter of credit be extended, "* * * all of our [Big Chrome's] obligations hereunder shall remain in full force and effect during the term of any such extension. * * *" One of Big Chrome's obligations under the letter of credit was to pay inter-

---

4. We need not decide whether Rizal granted additional extensions after that date, in the sense "extension" is used in Art. 2079 of the Code.

est at the stipulated rate. We construe the quoted language to mean that, in the event of any extension, Big Chrome bound itself to pay interest during the entire period of the extension and could not relieve itself of that obligation by earlier payment of the principal amount due. In our opinion, this undertaking constitutes ample consideration for the extension. *See* A. Corbin, Contracts 181, 275–276 (1963).

The concept of cause, under Philippine law, as related to contracts, is defined in Art. 1350 of the Code. Rizal concedes that the district court correctly defined cause for the jury as follows:

"Any reason of substance which may induce the execution of an agreement can be the cause of the agreement. Thus, any promise or performance of a thing or service by the other contracting party can be a sufficient cause to make the obligation binding."

In General Enterprises, Inc. v. Liange Bay Logging Co., L. 18487, August 31, 1964, cited by Rizal, the cause of a contract was defined as

"* * * the essential reason which moves the contracting parties to enter into it * * * the immediate, direct and proximate reason which justifies the creation of an obligation thru the will of the contracting parties."

As noted above, Big Chrome's president, Robles, wrote to Rizal's attorney on October 14, 1964, stating that, if an extension were granted, Big Chrome hoped to settle its obligations in full and in one lump sum. On November 13, 1964, Robles again wrote to Rizal's attorney, stating that one of Big Chrome's purposes in applying to DBP for a loan (feasible only if an extension were granted) "* * * is to pay our said account with your bank in full."

While Rizal could have accelerated payment of the full amount and taken immediate legal steps to recover that amount, there was then little likelihood that it could actually make such a recovery. By holding off on this and giving Big Chrome an opportunity to borrow the amount from DBP, Rizal enhanced its ability to recover the full amount from Big Chrome.

In addition, in his letter of November 16, 1964, notifying Robles that Big Chrome had been granted an extension, the vice president of Rizal stated: "* * * we look forward to more banking transactions with you."

In our view, these expressions indicating how Rizal might gain by granting an extension to Big Chrome show that Rizal had cause, as that term is understood in Philippine law, to grant the November 16, 1964 extension. Article 1354 of the Code provides that "[a]lthough the cause is not stated in the contract, it is presumed that it exists and is lawful, * * *" unless the contrary is proved. We can thus assume that Rizal's cause for granting subsequent extensions was similar to that set out above.

We accordingly hold that Rizal did grant Big Chrome extensions within the meaning of Art. 2079 of the Code.

The question remains whether Putnam, as guarantor, consented to such extensions. Under the express language of Art. 2079, the guaranty would not be extinguished by the extensions if Putnam consented thereto.

Rizal argues that Putnam did consent thereto, not by any action on his part while the extensions were under consideration by Rizal, but in advance of all extensions by reason of the specific language of the guaranty undertaking. If, indeed, the undertaking provides for advance consent to such extensions, the fact that Putnam did not read the undertaking would be immaterial. Manila Surety & Fidelity, Inc. v. Villarama, 107 Phil. 891, 899–900 (1960).

In construing the language of the undertaking we find guidance in two principles which prevail in both the Philippines and the United States:

1. Ambiguous language in a contract should be construed against the

party who drafted the ambiguous provision.[5]

2. The extent of a guarantor's liability is limited by the clear terms of the contract and cannot be extended by mere implication. Solon v. Solon, 64 Phil. 729 (1937); La Insular v. Machuca Go-Tauco and Nubla Co-Siong, 39 Phil. 567 (1919).

The undertaking in question is a printed form drafted and supplied by Rizal. There are several phrases in it which are subject to more than one interpretation. Rizal claims that the second and third paragraphs of the undertaking, set out in the margin, constitute clear consent by the guarantor for extensions of time for payment of the debt.[6] Putnam offers a different interpretation.

First we consider the language in the second paragraph of the undertaking which provides that any securities which Rizal holds or will hold as collateral.

"* * * to any evidence of debt or obligation or upon which a lien may exist thereto, may be withdrawn or surrendered at any time, and the time for payment thereof extended, without notice to, or consent by the undersigned. * * *"

Although Rizal admits that this provision is subject to two meanings, it contends that only one interpretation makes any sense in light of this banking transaction. This interpretation is that the extension of time for payment refers to the "evidence of debt or obligations" meaning the principal debt of Big Chrome for which Putnam is the guarantor.

Putnam urges that we interpret this phrase to mean only that the time for payment of any securities pledged as collateral for the loan may be extended without the guarantor's consent. For example, if an account receivable had been pledged, the bank could extend the time for payment of that account by its obligor without the consent of the guarantor on the principal debt. Rizal's counsel admitted that Putnam's interpretation "* * * may have some merit in terms of the phrasing of the quoted sentence."

Rizal also argues that two other phrases in the undertaking, one in the second paragraph and one in the third paragraph, imply that no time limitations are to be applied to Putnam's liability. These are:

1. "* * * [Guarantor] will at any time on demand when said obligations are due, pay to the RIZAL COMMERCIAL BANKING CORPORATION the above-mentioned obligation of the principal."

2. "The herein undersigned shall be released from its liability under this guaranty only after the principal or said undersigned has fully satisfied or paid its above-mentioned obligation

---

5. Phil.Civ.Code Art. 1377 (1959):
   "The interpretation of obscure words or stipulations in a contract shall not favor the party who caused the obscurity."

6. "The undersigned expressly waives all rights to presentment for and notices of dishonor and/or protest, and agrees that the securities of every kind, that are now and may hereafter be left with the RIZAL COMMERCIAL BANKING CORPORATION, its successors, indorsees or assigns as collateral to any evidence of debt or obligations or upon which a lien may exist thereto, may be withdrawn or surrendered at any time, and the time of payment thereof extended, without notice to, or consent by the undersigned

and the liability on this guaranty shall be solidary, direct and immediate and not contingent upon the pursuit by the RIZAL COMMERCIAL BANKING CORPORATION, its successors, indorsees or assigns, or whatever remedies it or they may possess, and the undersigned will at any time on demand when said obligations are due, pay to the RIZAL COMMERCIAL BANKING CORPORATION the above-mentioned obligation of the principal.
   "The herein undersigned shall be released from its liability under this guaranty only after the principal or said undersigned has fully satisfied or paid its above-mentioned obligations with RIZAL COMMERCIAL BANKING CORPORATION."

with the RIZAL COMMERCIAL BANKING CORPORATION."

At the time the undertaking was executed, the parties contemplated that Big Chrome would execute a chattel mortgage on the mining machinery in favor of Rizal as security for the loan. In addition, Big Chrome had established a time deposit in the bank. Although no debts or obligations owed to Big Chrome were to be pledged, the loan was to be paid from proceeds of the mining operation.

Unless there were provisions in the undertaking to the contrary, Rizal would have been required to exhaust its remedies against Big Chrome and the pledged assets before it could have compelled payment by Putnam as a guarantor. Phil.Civ.Code Art. 2058 (1959). In addition, the seizure and sale of the things pledged would extinguish the principal obligation regardless of whether the proceeds of the sale are equal to the amount of the principal obligation. Phil.Civ.Code Art. 2115 (1959).

Apparently to avoid the effect of these rules, Rizal adopted the language in the undertaking. The provisions concerning the securities pledged as collateral may have been incorporated to allow Rizal freedom to dispose of those securities ("withdrawn or surrendered") without extinguishing the principal obligation under Art. 2115. The requirement that the guarantor pay the debt at any time when it is due without requiring Rizal to first pursue its remedies against Big Chrome avoids the effect of Art. 2058. That language does not, in our opinion, enable Rizal to demand payment from Putnam for an indefinite period of time after the Big Chrome debt had matured in full.

■ The rule that releases a guarantor from his obligations when, without his consent, the creditor grants an extension of time for payment to the principal debtor is intended to protect the guarantor's right to be subrogated to all the rights of the creditor.

" * * * [I]f the creditor has tied his own hands from proceeding promptly, by extending the time of collection, the hands of the surety [guarantor] will equally be bound; and before they are loosed, by the expiration of the extended credit, the principal debtor may have become insolvent and the right of subrogation rendered worthless. * * * " Radio Corporation of the Phillipines v. Roa, 62 Phil. 211, at 217 (1935).

The court in that case went on to state that the existence of actual prejudice was not a determinative factor; nor was the potential benefit of the extension to the guarantor. The court relied upon the rule that the terms of a guaranty contract cannot be changed without the knowledge and consent of the guarantor. *Id.* In any event, the prejudice to Putnam resulting from Rizal's grant of extensions is apparent. Big Chrome continued to increase its debt; the value of the collateral was diminished by the foreclosure of other creditors; the machinery was deteriorating because of continued non-use and non-maintenance; and, as it happened, one of the co-guarantors died.

Whether or not Rizal intended the undertaking to mean something other than what the defendant or this court construes it to mean is immaterial. The fact remains that the language is far from clear and, as such, must be interpreted against Rizal. Putnam's obligations as guarantor cannot be enlarged by implication. No consent by Putnam to the extensions can be clearly found in the language of the undertaking, and no such consent can be read into that agreement by a court of law.

■ We therefore hold that the quoted language of the guaranty undertaking did not evidence Putnam's advance consent to the extensions granted. It follows that the extensions of time granted by Rizal to Big Chrome for the payment of the amount due on the deferred letter of credit extinguished Put-

ñam's liability as a guarantor of that debt.

In view of this determination the trial court would have been obliged to enter judgment for Putnam even if none of the grounds upon which the jury relied in reaching a general verdict for Putnam, as reflected in the special verdicts, are sustainable on appeal. Accordingly, we

Affirm.

SMITH, District Judge (dissenting).

I respectfully dissent. I think that if the whole of the instrument of guaranty is read to determine the intention of the parties (Art. 1370, Civil Code of the Philippines) the defendant did give his advance consent to extensions of time. If the defendant was not discharged by these extensions, then in my opinion there is no real factual issue and defendant is liable as a matter of law.