Plaintiff, Terry Couch, appeals the summary judgment in favor of Woody Anderson Ford, Inc., Ford Motor Company, Inc., and certain fictitiously named defendants, in an action alleging fraud, misrepresentation, and suppression of material facts concerning a truck purchased by Couch from Woody Anderson Ford on August 5, 1988. We affirm.
In the process of purchasing the vehicle from Woody Anderson Ford, Couch signed several documents, including a "buyer's order"; that buyer's order contained the following acknowledgement and disclaimer:
 "THE PURCHASER HEREIN ACKNOWLEDGES THAT THIS VEHICLE MAY HAVE HAD MECHANICAL AND/OR BODY REPAIRS. SAID VEHICLE MAY HAVE SUFFERED DAMAGE DURING PRODUCTION, TRANSIT, WHILE IN THE POSSESSION OF A PRIOR OWNER OR IN THE POSSESSION OF THE SELLER. THE SELLER MAKES NO REPRESENTATIONS AS TO FORMER DAMAGE, IF ANY, NOR WARRANTIES AS TO THE REPAIR OF SAME."
The above-quoted material was set out in bold lettering from the rest of the document and the document was signed by Couch directly beneath this language. Couch also signed a clause contained in that document that stated he had read, understood, and accepted the provisions of the buyer's order.
Three months after purchasing the truck, Couch decided to trade it in. It was at this time that he learned the passenger-side door appeared to have been repainted.
On November 15, 1988, Couch sued Woody Anderson Ford and Ford Motor Company, alleging fraud, misrepresentation, and suppression of material facts. After Couch was deposed by the defendants, Woody Anderson Ford and Ford Motor Company moved for summary judgment, asserting that no genuine issue of material fact remained and that Couch was unable to show either a misrepresentation by the defendants or reliance by him on a misrepresentation.
In response to the defendants' motion for summary judgment, Couch filed an affidavit stating that he had specifically inquired as to whether the truck had been damaged or repaired and that a salesman/representative of Woody Anderson Ford had told him that it had not. Couch also stated in his affidavit that he did not read the disclaimer and was rushed into signing the buyer's order.
The trial court, in its order entering summary judgment, found that "the affidavit of Terry Couch is in direct contradiction with certain testimony given at the deposition of Mr. Couch, and, thereby, cannot be considered by this Court to establish [a] genuine issue of material fact on those contradictory issues." The trial court then found that there was no substantial evidence to support the finding of a genuine issue of material fact and that the defendants were entitled to a judgment as a matter of law.
On appeal, Couch argues that the inclusion of the aforementioned disclaimer does not preclude an action for fraud, misrepresentation, and suppression of material facts.
We note that this action was commenced after June 11, 1987; therefore, the applicable standard of review is the "substantial evidence rule." See Ala. Code 1975, § 12-21-12.
This Court has recently stated:
 " 'When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, *Page 890 
without explanation, previously given clear testimony.'
 "[A party] cannot be allowed to create an issue of fact by providing an affidavit that contradicts, without explanation, his prior deposition testimony."
Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961
(Ala. 1987) (citations omitted).
Couch gave the following testimony during his deposition:
 "Q All right. Tell me about what conversation you had with Mr. Case, what he told you, what you told him, and what your wife told him.
 "A This time we went down there, and I asked to speak to Burt Franklin, and he said Burt wasn't there on that day. So, I said, 'Well, I see the truck is back out here. You know we come down to look at it before.' And he said, 'Yeah.' And I said, 'I would like to see about getting it.' I said, 'I brought my other car down here.' And it was an '84 Toyota Celica that we had brought down there to trade in. And he said, 'Well, have you drove the truck before?' And I told him yes, I had drove it. And he said, 'Well, if you would like to drive it again — ' and I said, 'Well, I have already drove the truck, and it hasn't been that long ago and can't much go wrong with a truck.' And he said okay, and we come in and we looked at it, and me and my wife decided if we really wanted it or not —
"Q You all looked at the truck again?
"A We looked at the truck again.
 "Q How long did you look at the truck, approximately?
 "A We were, you know, looking at the interior and whatever, to make sure that we liked it, and we sat in it, to be sure we wanted it.
 "Q Did you walk around the exterior and look at it?
"A Yes, we looked around it.
 "Q Was Mr. Case out there with you when you were looking at the truck?
"A Yes, sir.
 "Q Do you recall anything he told you at that time?
 "A I asked him why was the truck not on the lot when we come back to look at it. I said, 'We come back here and the truck was gone,' and he said, 'I don't know. I will go find out.' So, he went back into the office, and he come back out and he said that the truck had been sold to somebody but their loan didn't go through, and they had it around back.
"Q Did he tell you where the truck was —
 "A He said it was around back, back behind the building.
". . . .
 "Q . . . Did you have any other discussions with Roy Case about this vehicle at that time?
"A Not that I recall.
"Q Did your wife?
"A No.
 "Q Was your wife always with you when you were talking to Mr. Case?
 "A No, sir. I had to go get my car and bring it to the lot, because when we first went there, we were at the used car lot, and I had to bring it down for them.
 "Q Have you had discussions with her about any other conversations that she had with Mr. Case?
 "A Only that they were talking about school. He has a daughter or somebody that is kin to him that went to the same school, and they knew each other, and that's what they were talking about.
". . . .
 "Q Did you have any discussions with the gentleman that handled the financing, the papers, that you can recall?
 "A Not other than him explaining the papers that we were signing.
 "Q Did he go over the papers fairly thoroughly with you?
"A Yes, sir.
 "Q Can you tell me basically what he told you about the papers?
 "A He just said, 'You are signing this for the loan.' 'This is how much you are financing.' 'This is signing your car over to us.'
 "Q He explained to you generally what you were signing? *Page 891 
"A Right.
 "Q Do you recall any other discussions that you had with him?
"A No, sir.
". . . .
 "Q What statements were made to you that the vehicle was of a new quality; do you know?
"A I don't recall no statements specifically.
". . . .
 "Q Do you have any evidence that Ford Motor Company did anything with intent to deceive you?
"A I have no evidence of anything like that.
". . . .
 "Q In your discussions with anyone at Woody Anderson Ford, no one evidenced any — or you didn't pick up any sense that someone was trying to dupe you, did you?
"A No."
In Couch's affidavit, filed in response to Woody Anderson Ford and Ford Motor Company's motion for summary judgment, he stated:
 "I specifically asked Mr. Case if the truck had ever been damaged or repaired in any way whatsoever. Mr. Case responded that he did not know but that he would check with the office. Upon returning he stated that the car had had absolutely nothing done to it and that it had not been damaged nor had any repairs. He stated that 'if the car had any work done on it or been damaged that they (Woody Anderson Ford) would have to show to you the paperwork on it.'
". . . .
 ". . . The paperwork [buyer's order] was not explained to me and I was given less than ten minutes to sign the papers.
 "The 'Buyer's Order' . . . was not explained to me and the [disclaimer] on the buyer's order . . . was not explained to me nor read to me. I was told merely to 'sign here.' I certainly did not understand that the vehicle was such that it may have been damaged prior to being sold to me. Had I known that the vehicle had been damaged or repaired I would not have purchased it. I told Mr. Roy Case, the salesman at Woody Anderson Ford, that and he assured me the vehicle had not been damaged nor repaired."
We agree with the trial court that the statements in Couch's affidavit are totally inconsistent with Couch's deposition testimony regarding any alleged misrepresentations that are the basis of his claim. The trial court did not err in so holding.
This case is similar to Planchard v. Dobbs Mobile Bay,Inc., 529 So.2d 942 (Ala. 1988), in which purchasers of an automobile alleged that the automobile was not "new," as the dealership said it was. In that case, we stated:
 "For their case to withstand [a motion for] summary judgment, there must necessarily be a scintilla of evidence [now substantial evidence] of damage, not mechanical difficulties, other than the type 'suffered . . . during production, transit, or while in the control and the possession of the seller.' They have shown none."
Planchard, 529 So.2d at 943.
That case involved a buyer's order that contained a disclaimer almost identical to that in the case now before us. Likewise, here, as in Planchard, there has been no showing of any damage other than damage of a kind referred to in the buyer's order disclaimer. The summary judgment in favor of Woody Anderson Ford and Ford Motor Company is, therefore, due to be, and it is hereby, affirmed.
AFFIRMED.
MADDOX, ALMON, ADAMS and HOUSTON, JJ., concur.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., dissent.