Frankie Williams, as guardian of Antrinique Cunningham, a minor, is the plaintiff in an action against BIC Corporation. The jury returned a verdict for the defendant, and the trial court entered a judgment on that verdict. Williams appeals from the trial court's order denying her motion for a judgment as a matter of law or for a new trial based on what she alleges was an erroneous jury charge.
 I. Facts and Procedural History
On November 15, 1991, Constance Cunningham and her three children, her sons Mark and Dontavious and her daughter Antrinique, occupied Cunningham's bedroom at her apartment. According to Mrs. Cunningham's best friend and next-door neighbor, Cassandra Formby, on the previous evening Cunningham and Formby had gone to the Oak Tree Lounge around 11:45 p.m. and had continuously drunk alcoholic beverages until they returned to their apartments at 3:45 a.m.; then they had talked for a while, she said, before each returned to her separate apartment. Cunningham testified that she went into her living room, because her back was hurting, leaving the sleeping children in the bedroom. Cunningham then fell asleep in the living room. Cunningham testified that some time later five-year-old Mark awakened her because three-year-old Dontavious had started a fire in the bedroom; she said he had started the fire by using a disposable lighter he had found on Cunningham's dresser; and she said the lighter had been manufactured by the defendant BIC Corporation. Dontavious testified in his deposition that Cunningham went into the bedroom when *Page 443 
she heard Antrinique crying. When Cunningham entered the bedroom, she said, she found two-year-old Antrinique on the bed, engulfed in flames. Cunningham said she pulled her off the bed and ran out of the apartment. Antrinique was severely burned in the fire and, since the fire, has had numerous surgeries and skin grafts.
On November 15, 1993, Cunningham, as mother and next friend of Antrinique Cunningham, a minor, filed a lawsuit in the Talladega County Circuit Court against BIC Corporation.[1]
She alleged that BIC had negligently and/or wantonly designed, manufactured, distributed, and sold the disposable lighter; that BIC had failed to warn of the dangers associated with use of the disposable lighter; that BIC had breached express and implied warranties; and that BIC was liable under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").
In May 1995, Frankie Williams, Antrinique's maternal grandmother, was substituted as plaintiff because she had been appointed legal guardian of Antrinique. The case proceeded to trial, and on December 8, 1998, the jury returned a verdict for BIC. The trial court entered a judgment on the verdict.
Attorneys for Williams prepared for her a motion for a new trial and, on January 7, 1999, sent a copy of that postjudgment motion to Betty Love, an attorney in Talladega. According to her affidavit, Love was not involved as counsel in this case but merely agreed to file the plaintiff's postjudgment motion after a copy of it was faxed to her office. In an affidavit, Love explained that Williams's attorneys sent the fax copy of the postjudgment motion to her office on January 7, 1999. She says that she then walked to the Talladega County circuit clerk's office and filed a copy of the motion the same day. The record does not contain a copy of the motion stamped January 7, 1999, however. The case action summary sheet indicates that the clerk's office received a copy of the motion by fax on January 7. Williams has submitted affidavit testimony from the circuit clerk stating that the clerk's office could not have received a copy of the motion by fax because that office does not have and never has had a facsimile machine. On January 7, 1999, the clerk's office apparently received a hand-delivered copy of the motion that Williams's attorneys had sent by fax to Love. On January 8, 1999, the clerk's office received the original motion in the mail and stamped it filed that same day.
On February 24, 1999, Williams amended her postjudgment motion. On March 3, 1999, BIC filed a motion to strike Williams's motion as untimely filed, relying on Ex parte Tuck, 622 So.2d 929
(Ala. 1993), which held that Alabama courts would not accept filings by facsimile transmission. After conducting a hearing, the trial court denied Williams's motion, stating in its order that the motion had not been timely filed. (Rule 59(b), Ala.R.Civ.P., allowed 30 days for the filing of that motion.) The court also stated in its order that if the motion had been timely filed the court would have denied it on the merits. Williams appealed.
 II. Timeliness of the Postjudgment Motion
Williams argues that the trial court erred in denying her postjudgment motion on the basis that it was untimely filed. She maintains that the copy of the motion that the clerk's office received on January 7, 1999, was a sufficient filing and was timely. Williams argues that Ex parte Tuck, on which BIC relies, does not support the trial court's conclusion that her motion was untimely filed. We agree. *Page 444 
The facts of this case are distinguishable from those of Exparte Tuck. In Tuck, the defendant Herbert D. McKay sent a copy of a notice of appeal by fax to the Talladega County courthouse. The Court of Civil Appeals held that McKay's notice of appeal, transmitted by fax within 14 days, satisfied the requirement of §12-12-70(a), Ala. Code 1975, that an appeal from the district court to the circuit court be filed within 14 days. McKay v.Tuck, 622 So.2d 926, 928 (Ala.Civ.App. 1992). However, Judge Robertson pointed out in his special writing that, because there was no facsimile machine in the circuit clerk's office, McKay's attorney sent a copy of the notice of appeal and security for costs by fax to another office in the Talladega County courthouse, with a cover sheet asking the recipient to take the document to the circuit clerk's office. 622 So.2d at 928 (Robertson, P.J., concurring in the result). McKay advised the circuit clerk's office that he was mailing the original motion the same day. Id.
at 927.
This Court reversed the Court of Civil Appeals' holding that a faxed copy of a notice of appeal would be accepted as a properly filed notice of appeal, but it held that McKay's facsimile filing would be considerd as timely, but for purposes of that particular appeal only. Ex parte Tuck, 622 So.2d at 930. The Court ruled that after July 31, 1993, it would not recognize facsimile filings except as they might be specifically authorized by rule or statute. Id.
Citing Ex parte Tuck, BIC contends that the trial court correctly held that Williams's motion was not timely filed, relying on the contention that she transmitted the motion to the court by fax. BIC maintains that the court received Williams's actual motion 31 days after the trial court had entered its judgment on the jury's verdict, one day beyond the 30 days allowed under Rule 59(b), Ala.R.Civ.P.
The Supreme Court of Tennessee also has refused to accept filings by facsimile transmission. In Love v. College LevelAssessment Servs., Inc., 928 S.W.2d 36 (Tenn. 1996), that court examined several factors in determining that a facsimile transmission of a notice of appeal is not sufficient to constitute a filing. Scarlett Love sued Nursing Careers and College Level Assessment Services, Inc. ("the assessment program"), seeking, among other things, rescission of a contract between her and the assessment program. Id. at 37. The trial court entered a judgment for Love. Id. On the last day allowed for an appeal, the assessment program sent the trial court a copy of a notice of appeal, by fax. Id. Love filed a motion to dismiss the assessment program's appeal, arguing that the assessment program did not file a notice of appeal with the trial court during the statutorily required period. Id. Apparently the trial court clerk had assured the assessment program that the faxed copy of the notice of appeal would be treated as an original. Nevertheless, the trial court denied Love's motion to dismiss the appeal. Id.
In determining that the facsimile transmission of the notice of appeal was not sufficient to perfect an appeal, the Supreme Court of Tennessee reasoned that counsel should refrain from using facsimile transmissions for filing court documents until uniform rules and procedures had been established to govern the use of facsimile transmissions. Id. at 38-39. The court agreed with Love's arguments that facsimile filing should not be allowed in the absence of a specific rule. Id. at 38. The court listed a number of reasons for not accepting filings by fax. Id. First, the court stated that Love was correct in stating that "timely perfecting of an appeal is no mere technical formality." Id.
Second, the court noted that, although facsimile transmission is a common, reliable method of transmitting information, a number of problems could arise if the courts allowed facsimile filings. Id.
For example, the court questioned whether a facsimile transmitted after the normal closing time of the clerk's office should be deemed as *Page 445 
filed that day or as filed the next day. Id. The court also noted that problems could arise when the facsimile machine had mechanical difficulties and it questioned whether the transmitting party should be required to present a transmittal sheet, whether the clerk's office should charge a transmittal fee, and whether a party should be allowed to file by fax a document that requires a filing fee. Id.
While the Supreme Court of Tennessee raised legitimate questions about facsimile filing that could pose problems, none of those problems is an issue in this case. Williams filed a postjudgment motion, not a notice of appeal. Most important, Williams did not send the motion to the Talladega County circuit clerk's office or some other office in the courthouse by facsimile. Her attorney sent a copy of her postjudgment motion to a Talladega attorney, who hand-delivered a paper copy of the motion to the circuit clerk's office. Therefore, questions regarding mechanical difficulties, a transmittal sheet, and the business hours of the clerk's office are irrelevant in this situation. In addition, a postjudgment motion does not require a filing fee, unlike a notice of appeal. It is undisputed that Williams did not send a copy of her motion to the Talladega County circuit clerk's office by facsimile transmission, but, instead, had a local attorney physically deliver and file a paper copy of it. The filing of that paper copy on January 7, 1999, was timely.
 III. Merits of the Postjudgment Motion
The trial court denied Williams's postjudgment motion on a conclusion that it had not been timely filed, but it also indicated that it would have denied the motion on the merits. Because we reverse the holding that the motion was untimely, we must address the merits. We will consider the motion as if it had in fact been denied on the merits.
Williams argues that the trial court's instructions to the jury erroneously permitted negligence on the part of the parent to be imputed to the child. BIC responds by contending that the trial court erred in failing to grant it a directed verdict (now known as a judgment as a matter of law; see Rule 50, Ala.R.Civ.P.) and, therefore, that this Court should not reach the issue whether the jury instruction was erroneous. BIC contends that Williams failed to show by substantial evidence that a lighter was involved in the fire; that, if a lighter was involved, the lighter was a BIC lighter; and that there had been an alternative design available for the lighter that would have prevented the fire. BIC next contends that the instruction at issue did not deal with contributory negligence but, instead, related to matters of foreseeability and proximate cause.
Williams counters by arguing that, because BIC did not cross-appeal, it is precluded from attacking on appeal the trial court's denial of its motion for a directed verdict. We have allowed a party seeking to uphold a summary judgment to argue in support of the judgment grounds that the trial court did not rely upon, even though that party had not filed a cross-appeal. Machen v.Childersburg Bancorporation, Inc., 761 So.2d 981 (Ala. 1999);McMillan, Ltd. v. Warrior Drilling Eng'gCo., 512 So.2d 14 (Ala. 1986). A similar rule should apply when a defendant prevails at trial and on appeal argues that the trial court improperly denied it a directed verdict. Rizal CommercialBanking Corp. v. Putnam, 429 F.2d 1112, 1115 (9th Cir. 1970), citing Jaffke v. Dunham, 352 U.S. 280, 281 (1957). Consequently, BIC, having moved for a directed verdict in the trial court, is not precluded on appeal from asserting insufficiency of the evidence as a basis for upholding the jury verdict in its favor.
 A. Sufficiency of the evidence 1. Applicable standard of review
BIC contends that the trial court erred in denying its motion for a directed verdict — i.e., a preverdict judgment as a *Page 446 
matter of law (see Rule 50(a), Ala.R.Civ.P.). When reviewing a ruling on a motion for a judgment as a matter of law, this Court uses the same standard the trial court initially used in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford,689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented substantial evidence to allow the factual issue to be submitted to the jury for resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). See also § 12-21-12, Ala. Code 1975, and West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A motion for a judgment as a matter of law "is properly denied where there exists any conflict in the evidence for consideration by the jury." Cloverleaf Plaza, Inc. v. Cooper Co., 565 So.2d 1147,1149 (Ala. 1990). "In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw." Daniels v. East Alabama Paving, Inc.,740 So.2d 1033, 1037 (Ala. 1999).
 2. Was a lighter involved?
BIC argues that the evidence concerning the instrumentality that caused the fire was extremely confusing. Cassandra Formby, Cunningham's next-door neighbor, was the first person to view the scene after the fire. She said she saw a burned box of matches, aerosol cans,[2] and lighters in Cunningham's bedroom. Cunningham testified that she had no idea how the fire started, although she had told the medical team at the hospital that the fire was caused by matches. Franklin Williams, Cunningham's brother, was living with her at the time of the fire. He testified that he had no idea what had caused the fire but that he was told by Cunningham or Mrs. Williams that the fire was caused by an exploding aerosol can. Franklin Williams also said that, on the day of the fire, he had left a lighter on the dresser in Cunningham's bedroom. Dontavious's deposition was read at the trial; when asked in his deposition how the fire had started, Dontavious replied, "I had a cigarette lighter." Then, when asked what he was doing with the lighter, he stated, "I was lighting the curtains." Dontavious, who was three years old at the time of the fire, was not asked about use of an aerosol can at the time of the fire. We conclude that the record, while it is in conflict regarding the presence of a lighter, was sufficient to justify the trial court's rejection of BIC's argument that it was entitled to a directed verdict on the ground that the evidence was insufficient for the factfinder to determine that a lighter had caused the fire.
 3. Was a BIC lighter involved?
BIC also argues that the evidence was insufficient to support a finding that a BIC lighter was involved. The only witnesses who testified at trial with certainty as to the presence of BIC lighters at the scene were Cunningham and Franklin Williams. Franklin Williams testified at trial that he generally bought BIC lighters, and at a later point in his testimony he stated that he bought only BIC lighters. Throughout the case and until three weeks before trial, some seven years after the accident, Franklin Williams's deposition testimony and Cunningham's deposition testimony were rather specific as to the color of the BIC lighter they said was present on the occasion of the fire. Franklin Williams testified by deposition that he had had only one lighter; that it was a black BIC lighter; and that he had left it on Cunningham's dresser on the morning of the fire. Cunningham testified by deposition that there was only one black BIC lighter in the house, saying "it was the only lighter we had." *Page 447 
Three weeks before the trial, in response to a request for admissions, Williams, as guardian, asserted that the lighter that caused the fire was a black or blue BIC lighter.
The state fire marshal's report plainly stated that a "yellow/orange . . . refillable lighter" had been recovered from the fire scene. While the lighter had been in the possession of the fire marshal at the time of the fire marshal's investigation, its whereabouts were unknown by the time the action was commenced two years later.
At trial, the investigating officer for the Talladega Fire Department testified that he found a yellow lighter that was similar to a BIC lighter or a brand of another manufacturer, but he could not say it was a BIC lighter, merely stating that it was similar to a BIC lighter. When asked to identify a BIC lighter from a group of lighters, he selected a lighter manufactured by another company. Fire department officials testified that firefighters found either a red or a yellow lighter at the fire scene. Cunningham and Franklin Williams testified that they had brought numerous lighters of various colors to the apartment in the months before the fire. Formby, the next-door neighbor, testified that she saw lighters of various colors, including yellow, black, and red, at the fire scene, but she never identified the lighters as BIC lighters. Hence, according to Formby's testimony, there were lighters other than a single black lighter at the fire scene. BIC points out that the testimony of Mr. Williams and Cunningham is the only evidence that links its lighters to the scene; that that evidence is inherently unreliable, by reason of the fact that those witnesses changed their testimony from that given in their depositions; and, therefore, that the trial court should have directed a verdict in its favor. We cannot say that the change in the witnesses' testimony regarding the color of the lighter is so critical as to authorize a directed verdict based on an analogy to the trial court's authority to enter a summary judgment even though there exists an apparent genuine issue of material fact, if that issue is created by a witness's affidavit that contradicts, without explanation, that witness's deposition. See Couch v. WoodyAnderson Ford, Inc., 558 So.2d 888 (Ala. 1989). Formby's testimony that at the fire scene she saw lighters of various colors, when coupled with Franklin Williams's testimony that he bought lighters of several colors in the months preceding the fire and that he bought only BIC lighters, constitutes evidence upon which the jury could have concluded that a BIC lighter was involved; the jury could have concluded this independently of the contradicted portion of the depositions of Franklin Williams and Cunningham dealing with the color of the lighter. The jury could have concluded that Dontavious started the fire with a BIC lighter other than the black BIC lighter on the dresser. The trial court properly rejected BIC's argument that it was entitled to a directed verdict on the ground that the plaintiff had failed to present substantial evidence indicating that a BIC lighter had been involved in the fire.
 4. Was there an alternative design?
BIC's final ground offered in support of its motion for a directed verdict is that the evidence was insufficient to show that an enhanced child-resistant feature on BIC lighters would have prevented this incident. When moving for a directed verdict in the trial court, BIC stated:
 "There's not been a shred of evidence on whether the newer lighter they're claiming should have been on the market would have stopped the fire, prevented the accident."
This Court considered the liability of a manufacturer of cigarette lighters in Bean v. BIC Corp., 597 So.2d 1350 (Ala. 1992) (BIC I), where this Court reversed a summary judgment in favor of the manufacturer because (1) the evidence created a genuine issue of material fact as to whether the manufacturer had a duty to offer the public a child-resistant lighter; (2) the evidence *Page 448 
created a genuine issue of material fact as to whether the danger posed by the lighter was open and obvious; and (3) the evidence created a genuine issue of material fact as to whether the warnings on the lighter and its packaging were adequate. The same parties returned in BIC Corp. v. Bean, 669 So.2d 840 (Ala. 1995) (BIC II), after a trial and the entry of a judgment in favor of the plaintiff. In BIC I, this Court described the scope of a manufacturer's legal duty as being dependent upon two factors: "(1) the foreseeability of the danger; and (2) the feasibility of an alternative design that averts that danger." Id. at 1352. (Emphasis added.) See also Townsend v. General Motors Corp.,642 So.2d 411, 418 (Ala. 1994), where this Court stated that, under the Alabama Extended Manufacturer's Liability Doctrine, the "plaintiff must prove that a safer, practical, alternative design was available to the manufacturer . . . that . . . would have . . . eliminated or in some way reduced" the plaintiff's injuries.
BIC first began manufacturing lighters with child-resistant features in 1991 or 1992. According to the testimony of BIC's experts, teaching a child to use a lighter through instruction, as opposed to the child's learning through nonverbal demonstration or observation, presents significant problems in designing and developing more child-resistant lighters. Once a child is taught to "roll and press" so as to ignite the lighter, the operation of BIC model J-7 with an enhanced child-resistant feature becomes relatively simple, for it requires only that the user engage a latch before beginning the roll-and-press ignition step. In other words, the roll-and-press ignition step is the more difficult function to master and, once that step is learned through instruction, the engagement of the latch, a comparatively simple step that requires no special timing or coordination, enables the user to ignite the lighter.
BIC contends that its evidence indicated that a child-resistant feature is ineffective once a child has been taught to ignite a roll-and-press lighter, and that that evidence was never rebutted. BIC, relying upon BIC I, contends that the record contains no substantial evidence indicating that the alternative design would have prevented the incident involved in this case — such evidence, BIC says, is an essential factor on which a manufacturer's duty is dependent. However, Dontavious denied that he had been taught to use a lighter. If the jury accepted his testimony, any inadequacy in the plaintiff's expert testimony, limited to the feasibility of a child-resistant lighter in the hands of a child who had not been taught to use a lighter, becomes immaterial.
We conclude that the trial court properly rejected BIC's argument that it was entitled to a directed verdict on the basis that the plaintiff's evidence of the feasibility of an alternative design was insufficient.
 B. Jury charge on foreseeability
Williams argues that the trial court erred in charging the jury as follows:
 "The Court charges that where a young child is under the sole custody and supervision of a parent, it is not foreseeable that the parent would fail to undertake basic precautions to safeguard her children from an obvious risk that is well known to the parent."
Citing Williams v. Woodman, 424 So.2d 611, 613 (Ala. 1982), Williams contends that this charge improperly permitted the jury to find in favor of BIC, notwithstanding that it may have found BIC to have been negligent, where a third party, and not the plaintiff, may also be guilty of negligence that contributes to cause the injury. Williams also maintains that this charge violates the rule that prevents the negligence of a parent from being imputed to the child. See Pilkington v. Peking ChineseRestaurant, 596 So.2d 586, 589 (Ala. 1992); Nunn v. Whitworth,545 So.2d 766, 767 (Ala. 1989); Alabama Power Co. v. Taylor,293 Ala. 484, 306 So.2d 236, 249 (1975). *Page 449 
In BIC II, an action against BIC arising out of personal injury and death that occurred as a result of children's playing with a butane lighter, this Court wrote:
 "One issue that did play a prominent role in the trial, however, regarded the Beans' supervision of their children. That issue was relevant to at least two elements of the plaintiffs' prima facie case, namely, foreseeability and proximate cause. As to foreseeability, the court charged the jury:
 "`The fifth element that the plaintiff[s] must prove to your reasonable satisfaction is that the lighter was being used in an intended or reasonably foreseeable manner at the time of the fire. The plaintiffs claim that it was reasonably foreseeable, at the time BIC marketed the lighter in question, that children too young to appreciate the dangers of operating the lighter, could obtain and operate the lighter.
 "`. . . Whether it was reasonably foreseeable that children too young to appreciate the dangers of operating BIC lighters, could obtain and operate such lighters is a fact issue for you to decide based on all the evidence presented.'
 "Also, forcefully presented in closing argument was BIC's contention that the Beans had failed to supervise their children and that their failure in that regard was the sole proximate cause of the fire."
669 So.2d at 845-46. (Some emphasis added.)
While a determination of the validity of these charges and of BIC's closing argument was not before the court in BIC II, its direct holding as to the relevance of foreseeability and proximate cause to the issue of appropriate parental supervision is sound. That holding compels us to conclude that an instruction linking conduct of a parent to these issues is appropriate under the facts of this case.
In Williamson v. Tyson Foods, Inc., 626 So.2d 1261 (Ala. 1993), this Court noted a distinction between the negligence of a parent in failing to supervise a child and the unforeseeability of such negligence. This Court stated:
 "Although this Court has stated that the contributory negligence of a parent will not be imputed to his child so as to bar the child's recovery, a consideration of negligence on the part of Nicholas's father is useful in determining whether the injury to Nicholas was foreseeable to Smith."
Id. at 1264. In Tyson Foods, this Court quoted with approval fromLaser v. Wilson, 58 Md. App. 434, 473 A.2d 523 (1984), in which the Maryland Court of Special Appeals concluded:
 "`The parental duty of supervision looking to the care and welfare of a child includes protecting it from known or obvious dangers. . . . If the parent has either been warned, or if the condition is or should be obvious to the parent, the [parent's] failure properly to supervise its child is the proximate cause of a subsequent injury.'"
626 So.2d at 1265. While we acknowledge that Tyson Foods deals with premises liability, we would have to overrule BIC II in order to hold that foreseeability and proximate cause arising from failure of parental supervision have no bearing in a products-liability case. This we decline to do.
The plaintiff tries to distinguish Tyson Foods by pointing toLooney v. Davis, 721 So.2d 152 (Ala. 1998), where a dentist's defense to a wrongful-death action based on the death of a patient following a tooth extraction was based on the contention that the seriousness of the physical injury was so unexpected as to constitute a defense even when the kind of injury itself was foreseeable. In Looney, this court rejected that argument and referred to Tyson Foods as illustrating a rule by which a defendant cannot be held liable when the kind of physical injury sustained by the plaintiff was itself unforeseeable. *Page 450 Id. at 162.
Here, as in Tyson Foods, a jury question was presented as to whether the kind of physical injury that occurred could have been foreseen, given the peculiar facts of the case.
In his deposition, Franklin Williams testified that he had taught the children, all of whom were five years old or younger, to use a cigarette lighter to ignite fireworks and that he had allowed them to do so in his presence. At trial, however, he testified that he had never put a lighter in the boys' hands or showed them how to use one. He further testified that in the boys' presence he had used a lighter to light fireworks, cigarettes, and spray from aerosol cans. He also testified that the children had seen him using an aerosol can and a lighter to burn a trail of ants on the porch at the apartment, that he had done this in front of the children only once, and that he had had to use the lighter several times to kill all the ants. He stated that Cunningham had told him not to do that again in front of the children because, he said she told him, they got excited when he did it. He acknowledged that Mark and Dontavious "were bad about playing with lighters."
Cunningham acknowledged that she had seen Franklin Williams using a lighter and an aerosol can to make a torch in front of the children and that Franklin had used a lighter to burn trash in a drum in front of the children. She also testified that Franklin had used a lighter to light fireworks in front of the children.
In addition, Formby testified that on several occasions she had seen Mark and Dontavious light cigarettes. She testified that she and Cunningham had on several occasions asked the boys to light cigarettes for them by using the gas stove in the apartment and that the boys had also lit cigarettes by using a cigarette lighter. She stated that it was not a surprise to her that the children knew how to use a cigarette lighter.
The facts before the jury, although in conflict in many instances, could permit a rationally functioning jury to conclude that a manufacturer should not reasonably foresee the occurrence of this kind of physical injury under such circumstances as we have described herein. The jury could have concluded that Cunningham returned at 3:45 a.m. from a bar after drinking for four hours and, after she returned, left three children, ages two, three, and five, asleep in an adjoining room in the apartment, an apartment in which were located numerous cigarette lighters and aerosol cans containing flammable materials, including several lighters and cans in the bedroom. The jury also could have found that at least two of these children had been trained by an adult to use cigarette lighters to light fireworks and cigarettes and that these children had at least witnessed, if they had not tried themselves, the use of a cigarette lighter to ignite the contents of an aerosol can so as to produce a torch. The jury also heard evidence indicating that the mother was aware of Dontavious's attraction to cigarette lighters, having seen him lighting one at age three, six months before the incident, and having indulged him in this fascination by having him light her cigarette and permitting Formby to have him light her cigarette and that she had seen Franklin Williams playing with fire, including igniting the contents of an aerosol can in the presence of the children. Finally, the jury could have concluded that, while the mother slept heavily in the living room from the effects of alcohol, Dontavious, age three, awakened in the bedroom, where there were numerous lighters and aerosol cans within his reach, used one of them to set fire to the curtains, and thereby caused his two-year-old sister to be severely burned. Under these facts, the jury could have reasonably concluded that the adults supervising the children, including Cunningham, were aware of the potential danger and displayed an incredibly casual attitude toward the dangers of allowing small children to be entertained by fire. *Page 451 
Under these circumstances, we cannot say that as a matter of law BIC should have foreseen the conduct of the parent in this case; thus, we cannot hold the instruction on foreseeability inappropriate. The trial court was careful in recognizing a distinction between the impropriety of a charge on contributory negligence and the propriety of a instruction dealing with foreseeability and proximate cause. We hasten to add that an instruction on foreseeability is inappropriate when it constitutes merely a disguised means of authorizing a jury to deny recovery to a child because of negligence on the part of a parent. The determination whether a charge on foreseeability is appropriate must be based on the facts of the particular case. Where the evidence of the obviousness of the danger, coupled with the parent's egregious and systemic failure to supervise, is as compelling as it is in this case, an instruction on foreseeability does not constitute a disguised charge on contributory negligence. We therefore conclude that in this particular case it was appropriate to charge the jury that it is not foreseeable that a parent would fail to undertake basic precautions to safeguard her children from an obvious risk well known to the parent.
AFFIRMED.
Hooper, C. J., and Maddox, Houston, Cook, See, and England, JJ., concur.
Johnstone, J., concurs in Part II and concurs in the result in Part III.
Brown, J., concurs in the result.
[1] She also sued BIC Societe, S.A.; Raceway, Inc., d/b/a Benny's Mini-Mart; Benny Green d/b/a/ Benny's Mini-Mart; and several fictitious defendants. The trial court dismissed BIC Societe, S.A., entered a summary judgment for Benny Green d/b/a/ Benny's Mini-Mart; and granted Cunningham's motion to voluntarily dismiss Raceway, Inc., d/b/a Benny's Mini-Mart.
[2] As is discussed in more detail later, Franklin Williams, Dontavious's uncle, had ignited the outflow from aerosol cans in the presence of the children and Cunningham.