June M. Henderson sued the estate of Hiliary H. Henderson, Jr. ("the Estate"), and her three stepsons, Hiliary H. Henderson III, David Poole Henderson, and Thomas Brooks Henderson ("the coexecutors") individually, and in their capacities as coexecutors of the Estate. Against the Estate, she alleged breach of contract, and against the coexecutors she alleged interference with contractual relations.
This case has previously been before this Court in Ex parte Henderson,732 So.2d 295 (Ala. 1999), wherein Ms. Henderson appealed from summary judgments entered in favor of the Estate and the coexecutors. We reversed the judgment of the Court of Civil Appeals, Henderson v. Henderson (No. 2970519), 740 So.2d 498 (Ala.Civ.App. 1998) (table), and remanded the cause for further proceedings.
The case proceeded to trial on Ms. Henderson's claims against the Estate and the coexecutors. The jury returned a verdict in favor of Ms. Henderson, awarding her damages of $250,000 on the breach-of-contract claim against the Estate and awarding her compensatory damages of $75,000 on the interference-with-contractual-relations claim against the coexecutors. The Estate moved for a new trial, or a remittitur of the damages; the trial court denied the motion. The court entered a judgment based on the jury's awards.
The Estate appeals. It argues that the damages awarded for breach of contract were not supported by the evidence. The coexecutors have satisfied the judgment against them, and they do not appeal. We affirm conditionally.
 I. Facts
On January 28, 1975, Dr. Hiliary H. Henderson, Jr., and June Massey Wood (now known as June M. Henderson) entered into a prenuptial agreement, which stated, in pertinent part:
 "In the event Mrs. Wood [June M. Henderson] survives Dr. Henderson, Dr. Henderson will cause to be paid to her for and during her lifetime, or until her remarriage, the income from his security account, which he presently estimates to be a sum of approximately $250,000. Upon the death or remarriage of Mrs. Wood, these securities shall be transferred to Dr. Henderson's three sons or their surviving issue. Nothing herein contained shall prohibit Dr. Henderson from changing investments in his security account or from selling securities and investing in other assets at any time after this marriage."
Ms. Henderson agreed that accepting the provisions of the prenuptial agreement precluded her from taking any future interest in Dr. Henderson's estate.
The Hendersons were married on February 9, 1975. In 1976, Dr. Henderson executed a will naming his three sons from a prior marriage as coexecutors. The will incorporated the prenuptial agreement. Before his death in January 1996, Dr. Henderson asked his sons to help him arrange his estate. The sons hired an attorney to review Dr. Henderson's estate plan. The attorney drafted a trust agreement and a new will for Dr. Henderson, but the attorney never had any direct contact with him. The new will and the trust agreement were executed in July 1995. At the time of Dr. Henderson's death, his security account contained eight stocks.
Ms. Henderson claimed that the trust agreement conflicted with the Hendersons' prenuptial agreement — which guaranteed her the income from all of the stocks in the security account — in that it provided *Page 193 
Ms. Henderson the income from only two of the eight stocks held in Dr. Henderson's security account at the time of his death. The remaining six stocks were bequeathed in the new will to the coexecutors as part of the residuary estate. The coexecutors sold these six stocks after Dr. Henderson's death and invested the proceeds in certificates of deposit. Ms. Henderson testified that she was not aware the new will and the trust agreement had been prepared until after Dr. Henderson's death.
Ms. Henderson sued the Estate, alleging breach of the prenuptial agreement and seeking relief in the nature of specific performance and seeking damages. She argued that the breach occurred when Dr. Henderson signed the trust agreement and the new will, dividing his security account and thus depriving her of the dividends agreed upon in the prenuptial agreement. The jury returned a verdict in favor of Ms. Henderson. The trial court entered a judgment on the jury's verdict, ordering that the damages award against the Estate be paid from the certificates of deposit that had been purchased from the proceeds of the sale of the six stocks, and that the remainder of those certificates of deposit be delivered to the corpus of the trust benefiting Ms. Henderson, in order to effectuate the terms of the prenuptial agreement.[1]
 II. Excessiveness of the Damages Award for Breach of Contract
The Estate does not challenge the trial court's finding that at the time of Dr. Henderson's death his security account included all eight of the stocks. Nor does it challenge the court's final order instructing the Estate in what manner to satisfy the judgment and implement the provisions of the prenuptial agreement. The Estate does, however, contest the damages award of $250,000 for breach of contract because, it claims, the award was not supported by the evidence.
The Estate argues that the only evidence Ms. Henderson offered to support her claim for damages for breach of contract was introduced in the form of a chart detailing the amount of dividend income the six stocks would have earned during the four years following the death of Dr. Henderson had those stocks remained in the trust and not been invested in certificates of deposit. The dividend income indicated by that chart totaled $64,343.29. The Estate also argues that the only other evidence offered that supported Ms. Henderson's claim for damages was offered by the Estate itself. Brooks Henderson testified that the certificates of deposit purchased from the proceeds of the sale of six stocks yielded the Estate approximately $25,000 per year in income, totaling $100,000 over the four years following Dr. Henderson's death.
Ms. Henderson argues that without knowing what elements the jury considered in making its decision to award her $250,000 in damages for breach of contract, this Court "is not in the position to take exception with [the jury's] findings."[2]
The trial court instructed the jury that the measure of the damages recoverable *Page 194 
for a breach of contract was "what amount would be sufficient to place [Ms. Henderson] in the same shoes she would have been in had the contract not been breached." While the prenuptial agreement may be susceptible to an interpretation that Ms. Henderson was due the principal amount of $250,000 at Dr. Henderson's death, the first appeal held that Ms. Henderson was due only the income from all the securities held in Dr. Henderson's security account, which was valued at $250,000 at the time of the agreement.[3]
Ms. Henderson cites Donavan v. Fandrich, 265 Ala. 439, 92 So.2d 1
(1957), for the proposition that if the jury verdict is supported by any reasonable hypothesis presented by the evidence, it should not be set aside. She argues that there was substantial evidence presented to the jury from which it could have arrived at the verdict, and she suggests several hypotheses as to how the jury reached that verdict. In Donavan, the plaintiff sued to recover $2,185 that he claimed the defendant owed him for seed. The jury, however, returned a verdict in favor of the plaintiff in the amount of $1,427.68. In reversing the judgment based on that verdict, this Court stated:
 "We have searched the record with considerable care and we are unable to find any evidence which tends to justify a finding of the amount fixed by the jury and for which judgment was rendered. Where, as here, the jury verdict cannot be justified upon any reasonable hypothesis presented by the evidence, it ought to be set aside upon proper proceedings as being the result of compromise or mistake, for neither the court nor [the] jury have the right to arbitrate or compromise differences between the parties. It is no adequate answer to say that a judgment for a larger amount might have been justified as a legal possibility. In this state of the case appellant's motion for a new trial should have been granted. Holcombe Bowden v. Reynolds, 200 Ala. 190, 75 So. 938 [(1917)]; Donaldson v. Fuqua, 232 Ala. 604, 169 So. 223 [(1936)]; [S.D.] Winn Cigar Co. v. Wilson, 35 Ala. App. 466, 48 So.2d 64
[(1950)]; Metropolitan Life Ins. Co. v. Ray, 28 Ala. App. 357, 184 So. 282 [(1938)]. Cf. Stremming Veneer Co. v. Jacksonville Blow Pipe Co., 263 Ala. 491, 83 So.2d 224 [(1955)]; Street v. Browning, 205 Ala. 110, 87 So. 527 [(1920)]."
Donavan, 265 Ala. at 440-41, 92 So.2d at 2; see also Fidelity Guar.Ins. Co. v. Sturdivant, 622 So.2d 1279 (Ala. 1993) (reversing a judgment based on a jury award of $23,176.42 because it was not supported by the evidence; the only testimony as to the measure of damages suggested either an award of $69,000 plus interest, which was offered by the plaintiff, or $1,164.75, which was offered by the defendant); Posey v.Myers, 370 So.2d 986, 986 (Ala. 1979) (reversing a judgment based on a jury award *Page 195 
in the amount of $14,000 because there was no evidence to support the award; "[i]t [was] uncontroverted that the amount involved in th[e] suit [was] $19,000"); State v. Crawford, 277 Ala. 568, 173 So.2d 109 (1965) (reversing a judgment based on a jury award in the amount of $1,900 where the testimony showed the proper amount of damages to be either $600 or $1,250).
Similarly, the only evidence suggesting the proper amount of damages that could be awarded on Ms. Henderson's breach-of-contract claim was the chart, which represented the dividend income from the six stocks as totaling $64,343.29, and the testimony of Brooks Henderson indicating that the certificates of deposit yielded $100,000 in interest income over the four years following Dr. Henderson's death. Ms. Henderson's closing argument to the jury acknowledged that the damages award could be, at most, $100,000,[4] and her attempt to justify a larger sum is a grasp at straws. In stating the "reasonable hypotheses" she suggests in her brief, Ms. Henderson overlooks the undisputed evidence, distorts the reasonable import of the testimony, and disregards the law of the case established in the earlier appeal.
After carefully considering the record, we find no evidence to support the jury's $250,000 damages award for breach of contract. The greatest amount of compensatory damages a jury could have awarded based on the evidence would have been $100,000. The trial court erred in denying the Estate's postjudgment motion for a new trial or, in the alternative, a remittitur of the damages. Therefore, we order a remittitur of the damages award to $100,000. If Ms. Henderson chooses not to accept this remittitur, the judgment will be reversed and the cause remanded for a new trial.
 III. Motion to Dismiss Appeal
Ms. Henderson also asks that this appeal be dismissed, based on the acceptance-of-benefits doctrine. She claims that the Estate used the judgment against it in order to obtain a tax benefit and that it should now be precluded from appealing that judgment.
Following the jury's verdict, the Estate amended its 1996 income-tax return, on which it had claimed approximately $21,000 in income from the stocks it had retained. The Estate delivered the amended tax return to Ms. Henderson. The document reflected that the dividend income was properly payable to Ms. Henderson for the year 1996. Ms. Henderson amended her 1996 income-tax return; the amendment caused her to have to pay additional taxes and interest for that year. When questioned by Ms. Henderson as to why it filed the amended return, the Estate responded in a letter:
 "All of the income which had been received from the six stocks or the funds invested as the result of their sale had been reported as income to the Estate. *Page 196 
As I understand the jury's verdict, [it] found that Mrs. Henderson, not the Estate, is entitled to that income. Therefore, the 1996 return was amended, which according to the accountants[,] had to be done by April 15, 2000. It is my clients' intention to go ahead and pay Mrs. Henderson the amount of income received during this period, since our only issue on appeal is the amount the jury awarded."
Ms. Henderson claims that because the Estate is now entitled to a refund of the tax that it had previously paid on the $21,000 in income, it has waived its right to proceed with this appeal.
Generally, where an appellant is shown to have accepted the benefits of the judgment, the appeal will be dismissed. Barnett v. Wooldridge,494 So.2d 459, (Ala.Civ.App. 1986). This notion is based on the principle of quasi-estoppel by election, which precludes a party from asserting, to the disadvantage of an adverse party, a right that is inconsistent with a position previously taken by him. Barnett, 494 So.2d at 460. Here, however, the Estate does not take an inconsistent position to the disadvantage of Ms. Henderson. The Estate, in amending its 1996 tax return, was simply acknowledging its liability to Ms. Henderson for the dividend income. The letter to Ms. Henderson clearly reserved the issue of alleged excessiveness of the damages award. Therefore, Ms. Henderson's motion to dismiss the appeal is denied.
 IV. Conclusion
The judgment is affirmed on the condition that Ms. Henderson file with this Court within 21 days a remittitur of damages on her contract claim to the sum of $100,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
MOTION TO DISMISS DENIED; AFFIRMED CONDITIONALLY.
MOORE, C.J., and JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
[1] The trial court's order stated:
 "(1) The Two Hundred Fifty Thousand Dollar ($250,000.00) judgment against the estate in this case is to be paid from the CD's or time deposits and the interest earned thereon held by the estate and which were purchased from the proceeds of sale of the six securities.
 "(2) The remainder of said CD's or time deposits with an accounting thereof shall be delivered to the trustee of the Henderson Security Account Trust Agreement dated July 14, 1995 as additional corpus of said trust and in full satisfaction of the duty of the estate to effectuate the terms of the antenuptial agreement."
[2] Ms. Henderson also argues that the doctrine of res judicata bars the Estate from appealing. She claims that the Estate has not appealed from the portion of the trial court's judgment that instructs the Estate on how to satisfy the judgment. Ms. Henderson bases this contention on material appearing in the docketing statement. That material indicates, however, that the appeal is from the "judgment based on a jury verdict." The coexecutors' notice of appeal refers to the final judgment and the order denying the motion for remittitur or new trial. The notice of appeal is sufficient to preserve the coexecutors' right of review. See Rule 3(c), Ala.R.App.P.
[3] This Court held in Ex parte Henderson, 732 So.2d 295, 297 (Ala. 1999), that "[t]he prenuptial agreement guaranteed Ms. Henderson the income from all of the stocks in Dr. Henderson's security account at the time of his death." Dr. Henderson estimated that his security account, not the income from that account, was valued at approximately $250,000 at the time the prenuptial agreement was executed.
[4] Ms. Henderson's closing argument to the jury stated, in pertinent part:
 "Now, let's look at the damages. You've got an exhibit here where we've got a [graph] and it puts on there what June would have gotten had she received income from all the stocks. It talks about the dividends from the six stocks, and that's — I want to get my figures right now. That's $69,984.79 [this figure contemplates attorney fees and taxes]. Those are dividends over 1996, '97, '98, '99. . . . Now, what that will do — what that will do will give June the dividend income that she should have gotten if all of these stocks had been placed in the trust like they were supposed to. But now Brooks comes along and he says we sold those stocks and we reinvested them. And we get more money than that. We're getting $25,000 a year. In those four years that comes to $100,000. So, really now it's $100,000 that you have to award June Henderson in order that she would have received that income that she was supposed to receive."