823 So.2d 1254 (2001)
ALLSTATE INSURANCE COMPANY
v.
David W. ESKRIDGE.
1981754.
Supreme Court of Alabama.
September 14, 2001.
As Modified on Denial of Rehearing December 14, 2001.
*1256 J. Russell Campbell and Yvonne Norris Beshany of Balch & Bingham, L.L.P., Birmingham, for appellant.
J. Gusty Yearout and John G. Watts of Yearout, Myers & Traylor, P.C., Birmingham, for appellee.
HARWOOD, Justice.[1]
David W. Eskridge sued his employer, Allstate Insurance Company, and Allstate's division manager, Nick Wamboldt, asserting various legal claims arising from Allstate's refusal to allow Eskridge to return to work after he had taken sick leave. The trial court entered a summary judgment for the defendants on all of Eskridge's claims except his breach-of-contract and fraud claims; those claims were tried before a jury in a trial that began on April 19, 1999. Eskridge dismissed his claims against Wamboldt during the trial. On April 22, 1999, the jury returned a verdict in favor of Allstate on Eskridge's claim of breach of contract and in favor of Eskridge on his claim of fraud. The jury awarded Eskridge compensatory damages in the amount of $2.1 million. The trial court entered a judgment on the verdict on April 27, 1999, and Allstate filed postjudgment motions seeking, alternatively, a judgment as a matter of law, a new trial, or a remittitur of the damages. The trial court denied Allstate's postjudgment motions on July 7, 1999.
Allstate appeals, arguing that it was entitled to a judgment as a matter of law because, it says, (1) Eskridge failed to prove the elements of his fraud claim and (2) Eskridge's fraud claim alleged promissory fraud and Eskridge failed to prove promissory fraud. Alternatively, Allstate says that it was entitled to a new trial because (1) the jury's award of damages was not accompanied by a finding of intentional fraud; (2) the jury's award of damages was unsupported by the evidence; and (3) the jury's verdict was the result of prejudice caused by allegedly improperly admitted evidence.
At the time of the trial in this case Eskridge had been employed as an Allstate agent for approximately 16 years. As a result of a head injury early in his life, he suffered from a neurological condition that caused him to experience memory loss and chest pains, among other things. Eskridge testified that although his condition affected his performance as an agent, he had been able to perform his job with assistance from his staff. Possibly because of the stress associated with his work for Allstate, Eskridge's condition deteriorated and his symptoms worsened over time. In December 1996, he scheduled a meeting with Wamboldt, then head of Allstate's Department of Human Resources, to discuss the possibility of taking sick leave. Under Allstate's employment policies, given the length of time he had worked for Allstate, Eskridge was entitled to up to 20 weeks of paid sick leave. Eskridge asked Wamboldt what he needed to do to take sick leave and what he would need to do when he was ready to return to *1257 work. Eskridge testified that their conversation was as follows:
"[Wamboldt] told me in order to go on sick leave, I needed to bring him a note from my doctor saying that I needed some time off; and I asked him then, I said, `Well, if I go on sick leave and I am off from work, what do I do to come back to work?' And he said, `David, from sick leave, all you have to do is just come back to work.'"
Wamboldt denied making the second statement Eskridge attributed to him, and he testified that he understood that Eskridge intended to take sick leave for "a couple of weeks" in order to undergo various medical tests. Eskridge testified that he was concerned about his job and that he would not have taken sick leave had he known that he would need a note from a doctor clearing him to return to work. He stated that at the time of the December 1996 conversation with Wamboldt, Dr. Greg Hill, his doctor, had already told him that he would never provide Eskridge with a note that indicated that he could return to work. Eskridge stated that in reliance on Wamboldt's statement that he could "just come back to work," he provided Allstate with a note from Dr. Hill and began taking sick leave on January 1, 1997. Dr. Hill's note recommended that Eskridge take medical leave for three weeks because he suffered from complex medical problems.
On January 13, 1997, Dr. Hill extended Eskridge's sick leave for one month so that he could be evaluated further. On February 20, 1997, Eskridge and Dr. Hill informed Allstate that Eskridge would be unable to return to work. Eskridge and Wamboldt met again in March 1997, and they discussed the possibility of Eskridge's taking an "illness leave of absence." Unlike sick leave, the illness leave of absence would be without pay. They also discussed the possibility that Eskridge might apply to MetLife Insurance Company (hereinafter "MetLife") for long-term disability benefits. Soon after the meeting, Allstate provided Eskridge with the necessary forms, and he applied for the disability benefits. In his application, Eskridge stated that he was unable to perform the duties of his job as a result of his medical condition. In his medical notes, Dr. Hill indicated that Eskridge's condition would only worsen over time.
Eskridge testified that in May 1997, near the end of his allowable 20 weeks of sick leave, one of Allstate's employees in its Department of Human Resources, Greg Hill,[2] contacted him. Eskridge said that in that conversation Hill told him that his disability claim would ultimately be denied, that his sick leave would soon expire, and that he needed to return to work. Eskridge attempted to return to work, but on his first morning back at work, he received a telephone call from an Allstate manager who told him he had to go home unless he could provide a note from his doctor indicating that he was "well." Eskridge had no doctor's statement to this effect, and he went home. In July 1997, MetLife denied Eskridge's application for disability benefits.
Although Eskridge's 20 weeks of paid sick leave expired in May 1997, he was allowed to remain on paid sick leave until *1258 September 1997. During that period, additional discussions took place between Eskridge and various Allstate personnel regarding the need for a doctor's clearance before Eskridge would be allowed to return to work. However, Eskridge never produced a statement from any doctor stating that he was able to return to work. In September 1997, Wamboldt informed Eskridge that he would be placed on unpaid "illness leave of absence" unless he could produce the required doctor's note within a few days. According to Eskridge, Wamboldt also informed him that he would be required to maintain, at his expense, his office and his book of business, but that he would not be paid commissions on renewals on that book of business. Eskridge testified that he would have been able to return to work and meet the requirements of his job at Allstate, even if it became necessary to hire additional staff, at his own expense, to help him. He filed this lawsuit on December 31, 1997.
We first consider Allstate's argument that the trial court erred in denying its motion for a judgment as a matter of law on Eskridge's fraud claim. Our standard for review of a trial court's ruling on a motion for a judgment as a matter of law is settled:
"When reviewing a ruling on a motion for a judgment as a matter of law, this Court uses the same standard the trial court initially used in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented substantial evidence to allow the factual issue to be submitted to the jury for resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). See also § 12-21-12, Ala.Code 1975, and West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A motion for a judgment as a matter of law `is properly denied where there exists any conflict in the evidence for consideration by the jury.' Cloverleaf Plaza, Inc. v. Cooper & Co., 565 So.2d 1147, 1149 (Ala.1990). `In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw.' Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1037 (Ala.1999)."
Williams v. BIC Corp., 771 So.2d 441, 446 (Ala.2000). See also Norfolk Southern Ry. v. Bradley, 772 So.2d 1147 (Ala.2000); Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303 (Ala.1997).
In light of the standard set out in Williams, supra, we examine the record to determine whether Eskridge presented substantial evidence of each element necessary to establish his fraud claim. "The elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence." Brushwitz v. Ezell, 757 So.2d 423, 429 (Ala.2000). We must view the facts in a light most favorable to Eskridge as the nonmovant, and Eskridge's version as to any fact in conflict is accepted over any conflicting version presented by Allstate. Williams, supra; Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); and Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
The fraud claim in this case relates solely to a question Eskridge asked Wamboldt during their December 1996 meeting. It is undisputed that Eskridge told Wamboldt that he was experiencing "spells *1259 where he would have the exact symptoms of a severe heart attack," associated with periods of memory loss, apparently precipitated by stress associated with his job. Eskridge testified that he said to Wamboldt: "[M]y doctor wanted me to take some time off from work and see if I would get better or the spells would get better; and I asked him how the sick leave policy with Allstate works." Eskridge testified that Wamboldt then advised him that "in order to go on sick leave, I needed to bring him a note from my doctor saying that I needed some time off." Eskridge planned for the sick leave to begin during the first part of January 1997. He said that he asked Wamboldt, "[W]ell, if I go on sick leave and I am off from work, what do I need to do to come back to work"? He said that Wamboldt answered, "David, from sick leave, all you have to do is just come back to work." Eskridge did not state in his trial testimony the length of the sick leave he had discussed with Wamboldt, although the following, somewhat ambiguous, exchange took place between Eskridge and his attorney after the attorney had elicited from him an explanation of the difference between "sick leave" and "leave of absence," as those terms were used in Allstate's "Human Resource Manual":
"Q. Now, in that book [Allstate's Human Resource Manual]and it is in evidence there is a provision in there about when you are on leave of absence and what is required to come back to work; am I right about that?
"A. Yes, sir.
"Q. And one of the requirements is a doctor's excuse, isn't?
"A. A certificate of health. Yes, sir.
"Q. A certificate of health. And under sick leave, which is different, there are some guidelines and rules and regulations about sick leave, aren't there?
"A. Yes, sir.
"Q. And is there any requirement under sick leave, when you get off of sick leave that you have a doctor's excuse?
"A. No, sir.
"Q. How long were you off on sick leave? How long was your sick leave?
"A. The paid sick leave?
"Q. Well, how long were you supposed to have? We are going to get into that.
"A. Twenty weeks."
Wamboldt, on the other hand, offered testimony concerning the length of the sick leave he and Eskridge had discussed, stating that he and Eskridge "talked about his illness to the extent of the fact that he had to have some tests done and he was going to be out for a couple of weeks to have those tests done."
With respect to the availability of 20 weeks of paid sick leave, Wamboldt testified on cross-examination as follows:
"Q. In the December meeting when you were discussing with him going on sick leave
"A. Yes.
"Q. You had arranged for 20 weeks; correct?
"A. We hadn't arranged for 20 weeks.
"Q. Well, weren't 20 weeks allowed for him to go on sick leave?
"A. But his discussion to me was that he was going to take a couple of weeks to have some tests done."
Wamboldt further testified that Eskridge told him "he had black-out spells and some things that he had to get checked out by a doctor and he wanted to go out at the beginning of the year for a couple of weeks to get some tests done."
Eskridge himself testified at another point, "[H]owever, after three weeks if I felt like I was able to go back to work, *1260 then I thought I could return to work without a note from Dr. Greg Hill."
After this December meeting, Eskridge contacted Dr. Hill, his treating physician, to obtain the note necessary for him to begin taking sick leave, i.e., a note saying that he "needed some time off." Dr. Hill responded by writing a letter on December 31, 1996, addressed "to whom it may concern," which Wamboldt received in early January 1997. That letter stated: "Mr. David Eskridge is a patient of mine who has suffered from several complex medical problems. Because of these I have recommended that he take a medical leave from work for three weeks." On January 13, 1997, however, Dr. Hill wrote a follow-up note, which was given to Wamboldt, advising the reader that Eskridge would "need to continue his medical leave of absence." The letter stated that Dr. Hill would reevaluate Eskridge in one month. That communication was followed by another letter written by Dr. Hill on February 20, 1997, again addressed "to whom it may concern" and delivered to Wamboldt, advising him that "Mr. David Eskridge has been unable to work in 1997 and it is my opinion that he will be unable to return to work."
Dr. Hill's office records, introduced into evidence, contain an entry dated December 31, 1996, the same date he wrote his first "to-whom-it-may-concern" note, reading as follows:
"Phone callpatient states according to wife seems worse, `spells' continue & drifting to left driving. His partner says he is forgetting things, missing time at work with spells where he is unable to stand secondary to severe weakness. Recommend medical leave if no betterhe wants to return to work. Must put in for sick leave today."
Dr. Hill's entry on his office records for February 20, 1997, the date of his last note, concluded with the statement that Eskridge "can't face going back to work & I believe the episodes would be much worse and incapacitating ... permanent disability."
On March 19, 1997, Eskridge signed a "Statement of ClaimLong Term Disability Benefits" for submission to MetLife. That form contained the following statement, to which Eskridge attested by his signature: "I know it is a crime to fill out this form with facts I know are false or to leave out facts I know are important." The form included the following questions: "Are you able to perform the important duties of your job on a regular basis? If no, which duties are you unable to perform? When do you expect to be able to perform important duties?" In response to those questions, Eskridge wrote: "I am unable to perform the important duties of my job on a regular basis due to medical reasons. I do not expect to be able to perform important duties of my job, sales[,] service, claims office[,] again." He answered in the negative the question inquiring whether he was able to perform "the important duties of some other job on a regular basis." Also submitted to MetLife was an "Attending Physician's Statement of Functional Capacity," signed by Dr. Hill on March 27, 1997, which contained a similar warning that "it is a crime to fill out this form with facts you know are false or to leave out facts you know are important." Dr. Hill identified Eskridge's "primary diagnosis affecting work ability" as "memory loss, emotional lability, episodic spells." He described the course of treatment he was providing as merely "supportive." He listed the onset date of Eskridge's symptoms as February 6, 1992, stated that Eskridge had ceased to work on December 31, 1996, and cited February 20, 1997, as the date of his most recent examination of Eskridge. Responding to a *1261 request in the form for additional information that might be "relevant to this patient's work ability," Dr. Hill wrote that Eskridge "has moderate impairment of cognitive ability[,] thought secondary to multiple brain trauma." By entering check marks in the optional boxes provided, Dr. Hill certified that Eskridge was totally disabled for his occupation and for any other occupation and that he would "never" be able to resume work activities in either his occupation or in any other occupation. Dr. Hill classified Eskridge's condition as "retrogressed."
Dr. Hill did not testify at trial. However, several pages of his deposition (taken on January 11, 1999) were read to the jury. In that deposition he stated that he still held to the opinion he had expressed in his letter of February 20, 1997, that Eskridge would not be able to return to work and that Eskridge was currently unable to work "in the capacity that he had." Asked if he would release Eskridge to return to work, Dr. Hill stated "I would be hesitant to release him to return to work and would advise him against that. If he were to show more improvement in a number of different areas, primarily the absent spells and the memory, I would not be as hesitant." Finally, Dr. Hill replied in the negative when he was asked if he would release Eskridge to return to work "[i]f driving a car was required, as a part of [his] job."
Among the materials Eskridge submitted to MetLife with his claim for disability benefits was a letter written by Dr. Hill on May 21, 1997. That letter included the following description of Eskridge's problems:
"[I]ntermittent episodes of altered ability to think and remember [along with] chest pain and inability to function well... have occurred at various times including driving a car where he drove it actually off the road and into a ravine. It occurs fairly frequently and lasts one to two hours at a time. During these episodes, he is unable to remember what he does at the time of the episode. This, of course, inhibits his ability to do any sort of work that requires cognitive awareness such as his insurance sales."
Dr. Hill went on to state in this letter that data available from a neuropsychologist who had examined Eskridge indicated that Eskridge suffered from "diminished ability to remember facts," along with "the aforementioned spells," which spells were believed to be "secondary to multiple head injuries suffered while playing college and high school football." Dr. Hill commented that Eskridge's diminished ability to remember facts "has resulted in memory loss which has caused him to be unable to perform his work." He attached and referenced "a copy of the record from Southeastern Neuropsychological Institute from [its] evaluation of Mr. Eskridge in February 1996," and went on to say that "[s]ince that time his spells have continued and his ability to remember important duties at work has diminished and because of this he is unable to continue his work as an insurance salesman." The report from Southeastern Neuropsychological Institute, dated February 29, 1996, listed the following "dates of assessment"January 23, 1996, February 1, 1996, and February 20, 1996. The report stated that the medical history that Eskridge had provided included the following information:
"Mr. Eskridge reports that he has historically had a very good memory but within the past year, has been forgetting important information and conversation both at work and at home. He reports that historically, he has had a very good visual memory until recently. His recent forgetfulness has caused him considerable difficulty at work. He reports *1262 that not only is he forgetting current events but he is also forgetting important events from his past. For example, he states that he was present at his 5-year-old daughter's birth but now has no memory of the event. He reports that he experienced his first memory `black-out' in mid-January. While driving a familiar route to a hunting lodge, Mr. Eskridge reports that he `blackedout' and `awoke' to find himself still driving, but 40 miles in a different direction from his original destination. He also reports that he has recently forgotten how to locate familiar locations while driving, such as forgetting the directions to a friend's home he has visited many times.
"Mr. Eskridge reports that he has also been experiencing progressive difficulties with attention/concentration. He describes episodes during which he suddenly becomes distracted by some extraneous stimulus around him and then cannot refocus his attention. He reports that these episodes last several minutes and leave him feeling confused with memory loss for events occurring during the episode.... He reports that the spells [of sudden-onset paleness/chest pain radiating down his left arm/elevated blood pressure/profuse perspiration/dizziness/lightheadedness/nausea] have become more frequent within the past year, now occurring two to three times per week. Mr. Eskridge reports that the spells typically start 24 to 48 hours after a stressful event.... He recalls that two or three years ago, he attempted to drive while having one of these episodes. He believes he may have lost consciousness or blacked-out but he lost control of his vehicle and it left the road and traveled down into a 300-foot-deep ravine.... Mr. Eskridge reports that he now avoids driving if he feels one of these spells coming on."
Among the information reported to Allstate in connection with Eskridge's submissions to MetLife was the content of an entry by Dr. Mark S. Husid on a March 22, 1996, "Follow Up Visit" chart, recounting the following problems Eskridge had experienced in driving: "He now mentions two occasions since January of this year when he is unable to account for 30-50 minutes while driving."
In an April 17, 1997, note, Dr. Hill reported that Eskridge had "had bad [spell] Monday while driving home & went & laid down and did o.k."
On October 16, 1997, Dr. Hill entered a note on his office records explaining that Eskridge's wife (herself a nurse) had written Dr. Hill a three-page letter explaining that her husband's episodes of "absence spells" were occurring more frequently, that "his ability to remember had worsened," and that "his ability to concentrate is worsening."
Wamboldt testified that after he received Dr. Hill's December 31, 1996, letter, stating that Dr. Hill was recommending that Eskridge "take a medical leave from work for three weeks," he expected Eskridge back in three weeks and would not have made him bring in a doctor's note to return to work at that time. Wamboldt further testified that after he received Dr. Hill's January 13, 1997, letter, explaining that Eskridge would "need to continue his medical leave of absence" and stating that Dr. Hill was going to see Eskridge again in his office in one month and reevaluate him, he would not have required a note from a doctor had Eskridge been in a position to return to work at the time of that reevaluation. Wamboldt testified that the first time he or anyone at Allstate determined that Allstate would require a doctor's note from Eskridge if he chose to return to work was when Allstate received *1263 Dr. Hill's February 20, 1997, letter. That letter advised Allstate that Eskridge had "been unable to work in 1997" and would "be unable to return to work." Wamboldt testified that, when Allstate received that information, "the decision was made that [Eskridge] did need a doctor's statement" to return to work from sick leave. Wamboldt explained, "if he had a doctor's excuse that says that he could no longer come back to work and he could no longer work, then we certainly would require him to have a doctor's statement releasing him and allowing him to come back in good health." In that regard, Wamboldt stated, Allstate would be "just asking for a release or certification of health," which would state that Eskridge "was well and able to return to work ... able to resume his duties as an agent." Wamboldt went on to explain that, in his opinion, the term "well" meant that Eskridge would be "able to do his duties as an agent, to be able to come back and perform his duties and his role in his position as an Allstate agent." He denied that Allstate would have required a "clean bill of health" saying that Eskridge did not have any medical problems, but, analogizing Eskridge's situation to that of a diabetic or an employee who needed medication to keep a problem under control, he said that such medical management would be "fine," because "what I am talking about is being able to do his job."
The December 1996 discussion between Eskridge and Wamboldt clearly involved an anticipated short-term sick leave. Eskridge testified that he told Wamboldt that he was requesting sick leave "because my doctor wanted me to take some time off from work and see if I would get better or the spells would get better." Wamboldt testified that Eskridge led him to understand that the sick leave would probably be for only a couple of weeks. He advised Eskridge that Eskridge would need to provide a note from his doctor saying that he needed some time off. Eskridge responded by providing the December 31, 1996, letter from Dr. Hill, which stated that Dr. Hill had recommended that Eskridge "take a medical leave from work for three weeks." This letter corroborated the understanding that Wamboldt already had from Eskridge, that Eskridge was seeking sick leave for a short duration. Moreover, Eskridge, who was privy to the letter, never contacted Wamboldt to correct the assertion made in the letter that the duration of the sick leave would be three weeks. As of the writing of the letter, Eskridge had not yet left his job to begin his sick leave, i.e., he had not yet acted in reliance to his detriment on any statement made to him by Wamboldt.
It is against that backdrop and within that context that Wamboldt's statement that all Eskridge had to do to return "from sick leave" was to "just come back to work," must be evaluated. Eskridge acknowledged during his testimony that the only information Wamboldt had at the time of their December 1996 meeting about the nature of Eskridge's health problems and the possible effect of those problems on his ability to do his job, was what Eskridge told him at that meeting. Further, Eskridge admitted that he already had information from Dr. Hill that indicated that Dr. Hill would never provide Eskridge with a medical clearance to return to work, information he did not share with Wamboldt. It was only after that meeting that Wamboldt began to learn from Dr. Hill about Eskridge's deteriorating health and changed circumstances. Finally, approximately one month after Dr. Hill had written to advise Allstate that Eskridge would be "unable to return to work," Allstate began to receive information in connection with Eskridge's application to MetLife for "total disability" benefits, describing very dire, and seemingly *1264 progressively deteriorating, health problems. Attesting by his signature that he knew that it would be a crime to report false facts, Eskridge certified to MetLife on March 19, 1997, that he was "unable to perform important duties of [his] job on a regular basis due to medical reasons" and that "I do not expect to be able to perform important duties of my job, sales[,] service, claims office[,] again." That assertion was corroborated by Dr. Hill's May 27, 1997, Attending Physician's Statement of Functional Capacity. Among other things, Dr. Hill certified that Eskridge was totally disabled and unable to work in his occupation or any other occupation, and that he would "never" be able to resume work activities, his condition having "retrogressed."
Because the complaint in this case was filed after March 14, 1997, our review of the extent to which Eskridge was entitled to rely on Wamboldt's statement is governed by the reasonable-reliance standard. Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). In Foremost, this Court discussed reasonable reliance in light of this Court's formulation of that standard in Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 759 (Ala.1983):
"If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."
(Citing Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413, 415 (Ala.1980).) The Court in Foremost stated:
"After careful consideration, we conclude that the `justifiable reliance' standard adopted in Hickox [v. Stover, 551 So.2d 259 (Ala.1989)], which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the `reasonable reliance' standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983). The `reasonable reliance' standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties."
693 So.2d at 421 (emphasis supplied).
Subsequent to Foremost, this Court has frequently applied the standard of reasonable reliance discussed in Torres to determine whether a claimant's reliance in a case alleging fraud was reasonable. See, e.g., Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454 (Ala.2000); Fisher v. Comer Plantation, Inc., 772 So.2d 455 (Ala.2000); and Ex parte ERA Marie McConnell Realty, Inc., 774 So.2d 588 (Ala.2000). See also Frank Crain Auctioneers, Inc. v. Delchamps, 797 So.2d 470 (Ala.Civ.App.2000); Roland v. Cooper, 768 So.2d 400 (Ala.Civ.App.2000).
As we stated in Oakwood Mobile Homes, supra, 773 So.2d at 461:
"A claim of fraud, including such fraud as fraud in the factum, requires the party making the claim to prove by substantial evidence that he or she reasonably relied on the alleged misrepresentation. Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). This Court explained reasonable reliance in Torres v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala.1983):
"`If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover....

*1265 "`"If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, `volenti non fit injuria.'"'"
(Emphasis omitted.)
The reasonable-reliance standard was also discussed in Fisher, supra, 772 So.2d at 466, as follows:
"In Cornelius v. Austin, 542 So.2d 1220, 1222 (Ala.1989), we stated:
"`We carefully scrutinize the plaintiffs case in a fraud action "because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests." Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, 758-59 (Ala.1983). In Torres, we held that "[i]f the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, `volunti non fit injuria.'" 438 So.2d at 759.'"
Applying the Torres standard of reasonable reliance to the critical conversation that took place between Eskridge and Wamboldt in December 1996, and considering the context of that conversation, i.e., "all of the circumstances surrounding it," Foremost, supra, 693 So.2d at 421, we cannot conclude that Eskridge could have reasonably relied on Wamboldt's statement that he could "just come back to work" to mean that Eskridge was authorized to take a sick leave of an indefinite and perhaps lengthy period and then return without any limitation on the time he would be away from work and without regard to the condition of his health when he returned.
Because we conclude that, under the circumstances of this case, Eskridge could not have reasonably relied upon Wamboldt's statement that Eskridge could "just come back to work" as a basis for his fraud claim, it follows that the trial court erred in denying Allstate's motion for a judgment as a matter of law as to that fraud claim. Accordingly, the judgment of the trial court must be reversed, and the cause remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and SEE and BROWN, JJ., concur.
JOHNSTONE, J., concurs specially.
WOODALL, J., concurs in the result.
HOUSTON, LYONS, and STUART, JJ., dissent.
JOHNSTONE, Justice (concurring specially).
I concur in the main opinion and all of its holdings and reasons. I add some supplemental analysis of my own.
The plaintiff Eskridge's particular proof of the essential element of fraudthat he relied to his detrimentconclusively disproves the essential elementthat his reliance was reasonable. I will explain.
Eskridge sues Allstate for fraud. The gravamen of Eskridge's claim is that Wamboldt, as agent of Allstate, falsely told Eskridge he would not need a doctor's note to return to work from sick leave. To prove that he relied to his detriment on Wamboldt's statement, Eskridge testified:
"Q. If you had known that you had to have a doctor's excuse or note to come back, would you have taken sick leave?

"A. No, sir, I would not have.

"Q. Had you had a conversation with your doctor up to that point about *1266 whether he would give you a note to get off of work?
"A. Yes, sir.
"Q. Would he have given you a note to get off work?
"A. Yes, sir.
"Q. Did you have a conversation with your doctor about whether he would give you a note to go back to work at that time?

"A. Yes, sir.
"Q. And what did he tell you?
"A. He told me that he would never give me a note to come back to work.

"Q. Was that a concern of yours?

"A. Yes, sir."
(R. 182-83.) This testimony reveals Eskridge's knowledge existing at the time he solicited the gravamen statement from Wamboldt. Eskridge describes his solicitation of the statement from Wamboldt this way:
"Q. Did you at some point ask or have a conference with Dr. Hill where you discussed either disability or just not working?

"A. Yes, sir.

"Q. And about when was that?
"A. I would guess the ones would be mid-1996 through the end of 1996.
"Q. Okay. And did you have a discussion with anybody at Allstate about this problem?

"A. Yes, sir, I did.
"Q. Who did you have that conversation with?
"A. Nick Wamboldt.

"Q. And approximately when was that conversation?
"A. In December of 1996.
"Q. What did you tell Mr. Wamboldt about your physical condition?
"A. We talked some about my physical condition. I told him that I had the symptoms of a heart attack and basically the same exact symptoms I described to y'all today.
"Q. And did you talk about taking the sick leave?
"A. Yes, sir, I did.
". . . .
"Q. When you talked to Mr. Wamboldt, tell us what the discussion was about, what was said by you and what was said by him.
"A. I went and saw Mr. Wamboldt in December of 1996, and mostly what we talked about was how stress affected my job, just like we had talked about today, and that my doctor wanted me to take some time off from work and see if I would get better or the spells would get better; and I asked him how the sick leave policy with Allstate worked.
"Q. All right.
"A. He told me in order to go on sick leave, I needed to bring him a note from my doctor saying that I needed some time off; and I asked him then, I said, `Well, if I go on sick leave and I am off from work, what do I do to come back to work?' And he said, `David, from sick leave, all you have to do is just come back to work.'
"Q. Okay. Nothing about any doctor's excuse?
"A. No, sir."
(R. 178-81.) Not only did Eskridge suppress from Wamboldt the fact that Eskridge was so sick that he would never be able to get a return-to-work note from his doctor, he expressly offered Wamboldt the hope that Eskridge "would get better or the spells would get better." (R. 181, lines 2-3.)
"Suppression of a material fact which the party is under an obligation to communicate *1267 constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
§ 6-5-102, Ala.Code 1975. (Emphasis added.) At best for Eskridge, his own testimony proves that he, Eskridge, deceived Wamboldt into defrauding Eskridge!
Allstate did not plead deceit as an affirmative defense. The very conduct by Eskridge that would constitute deceit, however, equally constitutes unreasonableness in his reliance, as a matter of law. The burden was on Eskridge to prove the reasonableness of his reliance.
While we must accord Eskridge all the favorable tendencies of the evidence and must resolve all reasonable doubts in his favor because he is the verdict-winner, his own description of his knowingly using half-truths to prompt Wamboldt to make the gravamen statement forecloses any fair inference that Eskridge was reasonable in his reliance. In other words, Eskridge is bound to have known that, had he told Wamboldt what he, Eskridge, knew that he was so sick his doctor would never give him a return-to-work notethen Wamboldt would not, without further inquiry, have told Eskridge he would not need a doctor's note to return to work.
HOUSTON, Justice (dissenting).
I have considered all of the background information on persons involved in this lawsuit, the confrontations, and threats between Allstate and Eskridge before January 1997, and Eskridge's duties as an agent and his performance before January 1997, as set out on pages 12 through 16 of Eskridge's brief. I do not think these facts are relevant to the alleged fraudulent statement made to Eskridge by an agent of Allstate in December 1996. However, I considered these facts to ensure that I was considering the facts in a light most favorable to Eskridge. Carter v. Henderson, 598 So.2d 1350 (Ala.1992).
"David, from sick leave, all you have to do is just come back to work." This was Nick Wamboldt's statement to Eskridge. There is evidence that this statement actually misrepresented Allstate's existing policy, which required a doctor's statement to return to work from sick leave, if "any employee ... is going to be out ... over maybe ten days." It was for the trier of fact to determine whether the statement was a false statement.
There is evidence that this was a material fact. Eskridge knew he had a serious illness, and he testified that he would never have taken "sick leave" if it had not been for the representation that all he had to do to come back after sick leave was to "just come back to work."
Was Eskridge's reliance on this statement reasonable? That, I also think, was a question for the trier of the facts. Wamboldt, the highest ranking Allstate employee in its human resource department in Alabama, made this comment to Eskridge in response to a direct question from Eskridge, at a meeting in Wamboldt's office, which lasted an hour. I know of no writing contradicting this oral representation that was given to Eskridge or that Eskridge, as a reasonable person, should have read between the time this oral representation was made and the time Eskridge took sick leave. Therefore, I think the reasonableness of Eskridge's reliance on this oral representation was for the trier of the facts to decide.
Clearly, Eskridge was injured. However, the amount of the damages awarded in this case for mental anguish concerns me.
At the request of the trial court, the foreperson of the jury in this case reported *1268 the following jury verdict: "We the jurors find that David Eskridge, plaintiff, versus Allstate verdict not guilty breach of contract. We do find him [sic] guilty of fraud. Compensation $100,000 and mental anguish $2 million." It is clear from the dialogue between the trial court and the foreperson that the jury was intent on awarding substantial damages for mental anguish. The jury was asked to "redeliberate" and to award one amount for compensatory damages, "for whatever type damages you are awarding him in compensatory, for whichever of the elements whether it be for wages, mental anguish or the like, you put that in compensatory."
The jury redeliberated for 10 to 15 minutes (R. Vol.XVI, p. 27) before returning a verdict for Eskridge and awarding $2,100,000 compensatory damages for fraud, the same amount as the previous verdict that designated the award as $100,000 compensatory damages and $2 million mental-anguish damages. It is obvious that $2 million of the jury's award was compensation for mental anguish.
I quote from Eskridge's brief:
"XIII. TESTIMONY REGARDING MENTAL ANGUISH
"Eskridge testified directly to his mental anguish and there was circumstantial evidence of his suffering as well. Eskridge's family lost over half of its income due to Allstate's refusal to enclose a check with the monthly pay statements. The pay statements showed in detail all of Eskridge's accounts that he had worked sixteen years to build and it showed where those accounts had renewed and it showed the amount of renewal commissions Eskridge was to receive but none of them contained the check that the pay statement said was `payable' to Eskridge.
"Eskridge testified that what he had worked years to develop (his book of business) was being taken away from him. His family was suffering due to his lack of income. Eskridge stated that it caused him to lose sleep and it was degrading. When Eskridge sought help from Wamboldt after being put on the leave of absence, Wamboldt laughed at him and his situation. During this time period Eskridge sent Wamboldt a letter detailing his situation about being required to keep his office open, his clients serviced, but not being allowed to go back to his office and not being allowed to support his family. Eskridge closed the letter, which memorialized a conversation he and Wamboldt had, by reminding Wamboldt that in response to Eskridge's dire situation, Wamboldt had laughed at him. Eskridge told Wamboldt that `my family and I can't survive if Allstate refuses to pay me.' After saying he would be forced to seek other avenues of help if things did not change, he asked `Nick, please [see] clear to do the right thing.' Wamboldt admits that Eskridge complained to him about being put on a leave of absence and that he had to have a way to support his family as he was not getting any money. When asked what he did to help him get any pay Wamboldt replied, `I didn't do anything in addition to that.' He was the top person for the State of Alabama in Human Resources but made no effort to help Eskridge get his commissions because of his understanding of company policy. Eskridge does not know of any other agent that has come off of sick leave that has been required to have a doctor's note. Wamboldt stated that Allstate had required [a] doctor's note for people coming off of sick leave but admits that no one ever asked him how to go back and try to find that a single name of a single person that this has been required of. Wamboldt agreed *1269 that he did not go back and look through any file in response to Eskridge's request for production."
Eskridge's counsel requested "close to $80,000 in compensatory damages." (R. 621.) Loss of future earnings were not pleaded in this case, and no evidence was presented concerning future earnings. Counsel did not request compensation for loss of future earnings during closing arguments, and trial counsel did not request, and the trial court did not give, any instructions concerning a loss-of-earning capacity.
In my opinion, and based upon other holdings of this Court, a $2 million mentalanguish-damages award is excessive. Delchamps v. Bryant 738 So.2d 824 (Ala. 1999). Sperau v. Ford Motor Co., 674 So.2d 24 (Ala.1995), vacated on other grounds, 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), aff'd on same grounds, 708 So.2d 111 (Ala.1997), cert. denied, 523 U.S. 1075, 118 S.Ct. 1519, 140 L.Ed.2d 671 (1998); Crown Life Ins. Co. v. Smith, 657 So.2d 821 (Ala.1994); Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993).
In closing argument, Eskridge's attorneys stated that Eskridge's mental-anguish damages were between $250,000 and $350,000 (R. 623-24). See Henderson v. Henderson, 804 So.2d 191 (Ala.2001). This is in line with the final awards in the cases cited above. Therefore, I would affirm the judgment of the trial court, conditioned on a remittitur of all of the awards in excess of $450,000 in compensatory damages: i.e., $350,000 for mental anguish and $100,000 for all other damage. Therefore, I must dissent.
LYONS, J., concurs.
LYONS, Justice (dissenting).
The majority opinion reverses the trial court's judgment and remands the case for the entry of a judgment as a matter of law for Allstate. It does so on the basis that Eskridge's reliance upon Wamboldt's statement to him (albeit contradicted by Wamboldt's testimony) that all Eskridge had to do to return "from sick leave" was to "just come back to work" was unreasonable. Implicit in this disposition is a finding that the evidence presented concerning the alleged representation was insufficient. My review of the record convinces me that the issue whether misrepresentations were made to Eskridge was properly submitted to the jury. Eskridge offered sufficient evidence (a) that Allstate had a policy of permitting a return to work from sick leave without a doctor's certificate and (b) that the duration of sick leave he had accumulated was sufficiently long (20 weeks) so as to extend well beyond the date of his attempted return.
The majority opinion points out that, as of December 31, 1996, Eskridge, but not Wamboldt, knew that his doctor would never give him a medical clearance to return to work. However, the evidence also indicated that Allstate had for some time dealt with Eskridge as an agent whose health problems required that he perform his duties with the assistance of other individuals employed by him. In other words, Wamboldt was not the equivalent of a shop foreman accustomed to dealing with a healthy steelworker who suddenly had health problems that had not been communicated to his supervisor. For all that appeared, Eskridge's inability to obtain a doctor's certificate to return to work was not a new circumstance that began in late 1996.
The majority opinion also points out that Dr. Hill's letter of December 31, 1996, written before Eskridge began his period of sick leave, limited the duration of sick leave to three weeks. The majority opinion observes that this letter tends to corroborate Wamboldt's testimony that his *1270 and Eskridge's discussion of sick leave was in the context of short-term sick leave. On the other hand, it is just as appropriate to infer that, based upon the letter from Dr. Hill, Eskridge as of the time of that discussion also did not contemplate a lengthy sick leave culminating in his inability to return to work. However, the evidence indicates that, by his own admission, Eskridge's condition significantly worsened. This circumstance brings to the fore the question of the reasonableness of Eskridge's reliance.
Looking at Eskridge's reliance as of January 1, 1997, when he began sick leave, and construing the evidence in Eskridge's favor, as precedent requires, Daniels v. East Alabama Paving, Inc., 740 So.2d 1033 (Ala.1999), can we conclude that the alleged representation entitled him to return from sick leave without a doctor's certificate, regardless of his condition? For example, could Eskridge construe the alleged representation to permit him to return from sick leave simply by being wheeled into his office on a stretcher in a comatose condition? Obviously, no reasonable person could interpret Wamboldt's alleged representation in this manner; therefore, any reliance on such a farfetched interpretation would be unreasonable, as a matter of law.
Did the evidence show conclusively that Eskridge was completely unable to return to work, and did he thus unreasonably rely on a farfetched construction of the alleged representation? The evidence indicating that Eskridge had applied for disability benefits and had described himself as disabled in the application for those benefits is an admission against interest and supports the view that Eskridge's case depends on an unreasonable interpretation of the representation. However, that evidence is not conclusive, especially where the evidence also indicates that the disability insurance company subsequently disallowed Eskridge's claim, concluding that he was not disabled. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (the Supreme Court held that the plaintiff's claims for Social Security disability benefits and for damages for violation of the Americans with Disabilities Act ("ADA") did not inherently conflict and that the plaintiff was entitled to an opportunity to explain the discrepancy between her statement to the Social Security Administration that she was totally disabled and her statement in her ADA claim that she could perform the essential functions of her job). The scenario in Eskridge's case presented a jury question on the question of his ability to discharge his duties, notwithstanding the absence of a doctor's certificate. The fact that a jury found in his favor on this issue establishes the reasonableness of his construction of the alleged representation. I therefore dissent from the majority's conclusion that Eskridge's reliance on the alleged representation was unreasonable as a matter of law.
I join Justice Houston's discussion of damages in his special writing.
STUART, J., concurs.
NOTES
[1] This case was originally assigned to another Justice. It was reassigned to Justice Harwood on July 11, 2001.
[2] Greg Hill and Eskridge's doctor, Dr. Greg Hill, are not related.